Sheridan SKEEN, et al., Respondents,

v.

STATE of Minnesota, et al., Appellants (C5–92–677) Respondents (C7–92–678)

and

Virginia Independent School District No. 700, et al., Intervenors, Respondents (C5–92–677) Appellants (C7–92–678).

Nos. C5–92–677, C7–92–678.

Supreme Court of Minnesota.

Aug. 20, 1993.

---

Mark B. Levinger, Sara Jones, Järvinen Asst. Atty. Gens., Hubert H. Humphrey III, Atty. Gen., St. Paul, for State of Minnesota, et al.

Thomas L. Fabel, Randy G. Gullickson, Minneapolis, for Sheridan Skeen, et al.

J. Dennis O'Brien, Eric J. Magnuson, Amy K. Adams, Minneapolis, for Virginia Indep. School Dist. No. 700.

Stephen F. Rufer, Law Office Building, Fergus Falls, for amici curiae Independent School Dist. No. 261, et al.

Christina L. Clark, Harley M. Ogota, Roger L. Barret, Rebecca H. Hamblin, Minnesota Educ. Ass'n, St. Paul, for amici curiae Minnesota Educ. Ass'n.

KEITH, Chief Justice.

This case presents the issue of whether the state's present system of educational finance is sufficient to meet the state constitutional requirement that the legislature "establish a general and uniform system of public schools" and provide sufficient financing to "secure a thorough and efficient system of public schools throughout the state."

The plaintiffs in this case consist of 52 school districts and ten parents who brought suit in October 1988 against the State of Minnesota, State Board of Education, and the Commissioner of Education ("defendants"), seeking declaratory and injunctive relief against the state by claiming that certain components of the Minnesota education finance system were unconstitutional under the Education Clause of the Minnesota Constitution. Minn. Const. art. XIII, § 1 ("Education Clause"). In June 1989, 24 higher tax base school districts joined the state by intervening as defendants in this case.

Following a 67–day trial in Wright County District Court, the court declared three components of the education finance system—referendum levy, debt service levy, and sup-

plemental revenue—unconstitutional under the Education Clause and the equal protection guarantees of the Minnesota Constitution, Minn. Const. art. I, § 2. The court held, under the Minnesota Constitution, that education is a fundamental right, property wealth or property tax base is a suspect classification under this constitutional provision, and wealth-based disparities between districts result in an "impermissible absence of uniformity" in the state educational system.

The state and intervenors separately appealed the decision to the court of appeals. The court of appeals consolidated the appeals and certified the matter to this court, which accepted certification. On appeal, this court is asked to decide whether the present state educational financing system is constitutional.

In addressing these concerns, we must be cognizant of the parties involved in this lawsuit, the language of the Education Clause under the state constitution, the components of the state educational financing system, and other underlying policy issues which are relevant to this court's consideration. Each of these will be considered below.

### A. The Parties

The parties to this lawsuit include 52 plaintiff school districts, 24 intervenor districts, and the State Department of Education. The 52 plaintiffs are primarily located in outer-ring suburbs and adjacent rural areas, and they represent about 25% of the state's K–12 enrollment. The majority of the plaintiff districts belong to the Association of Stable and Growing School Districts (ASGSD). These districts have been experiencing a higher than average enrollment increase, with their enrollment rising by 22% between the 1973–74 and 1987–88 school years. Meanwhile, state-wide enrollment declined by 12% over the same time period. Although the resident income and home values in plaintiff districts are somewhat above the

state average, their school districts have property tax base per pupil unit (ppu) below the state average.

The 24 intervenor districts are a mix of inner-ring suburbs and Iron Range schools, and they represent approximately 17% of state enrollment. Many of these districts belong to the Association of Metropolitan School Districts (AMSD). These districts experienced a 32% decline in enrollment, on average, between the 1973–74 and 1987–88 school years. In fact, some of these districts lost more than 50% of their enrollment during the aforementioned period. Their property tax base is significantly above the state average.

Unlike challenges to state financing of education in other states, which frequently have been initiated by property-poor inner-city districts, this case does not involve the three largest metropolitan school districts, Minneapolis, St. Paul, and Duluth. Although these districts contain the majority of AFDC and minority population, they also have the highest property tax base because the state places a higher property tax rate on commercial entities. In addition, this case is somewhat atypical because the small, rural districts also are not included. These rural districts, which represent less than 12% of the state's pupil population, comprise over half of the total number of school districts.

### B. The Education Clause and Claims of Relative Harm

The provision which generates the impetus for this lawsuit is the Education Clause of the Minnesota Constitution.[1] This provision requires a "general and uniform system of public schools," but, unlike many cases in other states, this case never involved a challenge to the *adequacy* of education in Minnesota. In fact, the parties conceded that all plaintiff districts met or exceeded the edu-

---

1. This Clause provides:
   **Uniform system of public schools.** The stability of a republican form of government depending mainly upon the intelligence of the people, it is the duty of the legislature to establish a general and uniform system of public schools.

   The legislature shall make such provisions by taxation or otherwise as will secure a thorough and efficient system of public schools throughout the state.
   Minn. Const. art. XIII, § 1 [hereinafter "Education Clause"].

cational requirements of the state. Rather, the plaintiffs' action is premised on claims of *relative* harm—i.e., harm caused by the availability of fewer resources in low-wealth districts than in their high-wealth counterparts. Plaintiffs contend that the present system causes disparities in educational opportunity which are related to property wealth, thereby leading to a lifetime of relative disadvantage which violates the uniformity requirement of the Education Clause.

C. *The General System of Education in Minnesota*

In evaluating plaintiffs' claim of relative disparity, it is important to understand the basic state property tax system which generates funds for state education as well as other funding mechanisms which districts may use to supplement the level of basic revenue provided by the state. The following chart demonstrates how the state's funding has changed over the last decade:

### *Total Dollar Amount of General Education Revenue by Category*
Selected Years (amounts in millions)

| Revenue Category | FY 80 | FY 84 | FY 88 | FY 90 |
|---|---|---|---|---|
| **Uniform Basic Revenue** | 1,070.2 | 1,202.1 | 1,663.6 | 2,303.1 |
| | | | | |
| Cost Differential Revenue: | | | | |
| Pupil Unit Decline/Growth | 65.6 | 67.4 | 5.1 | 00.0 |
| Compensatory/AFDC | 48.4 | 70.5 | 101.1 | 63.6 |
| Teacher Retirement | 131.7 | 178.6 | 238.7 | 00.0 |
| Sparsity | 1.7 | 2.3 | 5.3 | 5.0 |
| Training & Experience | 00.0 | 00.0 | 130.2 | 14.3 |
| Low Fund Balance | 00.0 | 30.8 | 000.0 | 00.0 |
| | | | | |
| **Total Cost Differential** | 247.4 | 349.6 | 480.4 | 82.9 |
| | | | | |
| **Grandfather/Supplemental** | 48.5 | 46.9 | 5.2 | 12.0 |
| | | | | |
| Referendum/Discretionary Revenue: | | | | |
| Referendum | 12.3 | 68.9 | 111.8 | 162.1 |
| Discretionary | 00.0 | 113.7 | 000.0 | 000.0 |
| **Total Referendum** | 12.3 | 182.6 | 111.8 | 162.1 |
| | | | | |
| **Total Revenue $ Millions** | $1,378.4 | $1,781.2 | $2,261.0 | $2,560.1 |

## Percent of General Education Revenue by Category
### Selected Years

| Revenue Category | FY 80 | FY 84 | FY 88 | FY 90 |
|---|---|---|---|---|
| **Uniform Basic Revenue** | 77.6% | 67.5% | 73.6% | 90.0% |
| | | | | |
| Cost Differential Revenue: | | | | |
| Pupil Unit Decline/Growth | 4.8% | 3.8% | 0.2% | 0.0% |
| Compensatory/AFDC | 3.5% | 4.0% | 4.5% | 2.5% |
| Teacher Retirement | 9.6% | 10.0% | 10.6% | 0.0% |
| Sparsity | 0.1% | 0.1% | 0.2% | 0.2% |
| Training & Experience | 0.0% | 0.0% | 5.8% | 0.5% |
| Low Fund Balance | 0.0% | 1.7% | 0.0% | 0.0% |
| | | | | |
| **Total Cost Differential** | 18.0% | 19.6% | 21.3% | 3.2% |
| | | | | |
| **Grandfather/Supplemental** | 3.5% | 2.6% | 0.2% | 0.5% |
| | | | | |
| Referendum/Discretionary Revenue: | | | | |
| Referendum | 0.9% | 3.9% | 4.9% | 6.3% |
| Discretionary | 0.0% | 6.4% | 0.0% | 0.0% |
| **Total Referendum** | 0.9% | 10.3% | 4.9% | 6.3% |
| **Total General Education Revenue** | 100.0% | 100.0% | 100.0% | 100.0% |
| **Total Revenue $ Millions** | $1,378.4 | $1,781.2 | $2,261.0 | $2,560.1 |

Thus, as the above chart indicates, the legislature has equalized more of the state funding for education in recent years, with the percentage of uniform basic revenue rising from roughly 67.5% in 1984 to 90% by 1990. This shift occurred in large part as a result of the legislature's 1987 reform of the educational financing system. At that time, the legislature eliminated separate funding for many categorical education programs and folded that money into the foundation program, thereby increasing the basic allowance and permitting district choice regarding the proper programs to offer. Under this new formula, programs such as summer school or gifted and talented programs were no longer separately funded. Instead, each district received a "lump sum" and was given discretion as to how to distribute this money.[2] These reforms resulted in plaintiffs receiving 8.1% more revenue, compared to intervenors' 3.8% increase.

In terms of generating the funding to meet the state's educational goals, the legislature has enacted various statutes in an effort to provide a "general and uniform" system of public education throughout the state. The state has accomplished this goal primarily by guaranteeing a certain amount of "basic revenue" (also known as "foundation revenue") to all districts in the state. This basic revenue is distributed on a "per pupil unit" basis, a figure which is adjusted according to the relative costs of educating students at various grade levels. Under the current formula, kindergarten students account for .5 pupil units each, with elementary students at 1.0 pupil units and secondary students at 1.3 pupil units. See Minn.Stat. § 124.17, subd. 1 (1992) (defining "pupil units" at various grade levels).[3] The number of students at each level is then multiplied by the corresponding "per pupil" figure for that grade level, and the totals are added together to derive the total number of pupil units in a given district. At the time of trial, the level of basic revenue was statutorily set at $2,953 per pupil unit ("ppu"), a figure which in-

**2.** At this time, about $90 million in funding for training and experience (T & E) was eliminated. This T & E money had been designed to compensate districts which had more experienced staff and teachers and therefore encountered higher costs. In the absence of such funding, districts with higher staff costs, many of which were intervenor districts, were forced either to cut spending or raise additional revenue through referendum levies.

**3.** At the time of trial, secondary students were weighted at 1.35 pupil units. See Minn.Stat. § 124.17, subd. 1(g) (1988).

creased to $3,050 ppu for 1992 and subsequent school years. *See* Minn.Stat. § 124A.22, subd. 2 (1992).

To generate funds for this system, the state requires that all school districts impose a uniform property tax. Minn.Stat. § 124A.23 (1992). Property taxes are assessed as a percent of tax base, and at the time of trial in 1991, this rate was set at 26.3%.[4] *See* Minn.Stat. § 124A.23. The state makes up any difference between the revenues raised by this tax and the guaranteed minimum. Minn.Stat. § 124A.23, subd. 4 (1992). This process is called "equalization."

Once referred to as "mills," the measure of property taxation is now calculated on the basis of "tax capacity." In determining tax capacity, a percentage of the property's market value is placed in the "tax base," which varies according to the type of property. The current percentages applied to various types of property are:

| | | |
|---|---|---|
| Residential Homestead | | |
| First $72,000 | 1.00% | |
| $72,000–$115,000 | 2.00% | |
| Over $115,000 | 2.50% | (in 1991) |
| | 2.00% | (in 1992) |
| | | |
| Residential Non–Homestead | | |
| 3 or less units | 2.80% | |
| 4 or more units | 3.50% | |
| | | |
| Commercial and Industrial | | |
| First $100,000 | 3.30% | |
| Over $100,000 | 5.06% | |

Minn.Stat. § 273.13 (1992). The net tax capacity for a school district is the sum of the amounts computed for each parcel of property in the district. Due to the increased percentages applied to commercial entities and apartment complexes, a district's net tax capacity may not correspond to the wealth of the citizens of a given school district but may instead reflect a greater percentage of commercial entities in that district. This weighted average system means that cities such as Minneapolis and St. Paul, which have the highest percentage of AFDC recipients, are also the school districts with the highest "wealth" under the state's net tax capacity system.[5]

### D. *Defining the Relevant Terms and Funding Programs*

Despite the more equalized funding throughout the state, plaintiffs contend that

4. The general education tax rate is the rate which raises the amount of revenue the legislature determines must be raised for a particular fiscal year. Thus, this rate varies from year to year depending on the amount of tax revenue necessary to fund the public school system.

5. Part of the debate between plaintiffs' and intervenors' position centers around the relative tax imposed on their taxpayers. The primary dispute focuses on the difference between "tax rate" and "tax burden."

Plaintiffs focus on tax rate and point out that a one percent property tax in a high property-wealth district will generate substantially more money than an equivalent increase in a low-property wealth district. Plaintiffs assert that this system gives an incentive to the high property value districts an incentive to pass referendum levies (or, conversely, a disincentive to low property value districts) to supplement the basic revenue formula, particularly because the low property wealth districts would have to impose a tax rate three to five times higher than the high property wealth districts in order to gain an equivalent amount of funds.

While a certain percentage increase in property taxes (i.e., tax rate) will generate more money for a high property value district, this calculation fails to take into account the relative *tax burden*. Intervenors note that the adjusted net tax capacity system (ANTC) used in Minnesota does not, like many other states, simply use the market value of property. Instead, a graduated system in which high value homes and commercial entities face a higher percentage tax than low value homes. *See* Minn.Stat. § 273.13 (1992). The net effect is that the high property value areas are paying a higher tax burden initially to generate the monies for the basic revenue formula. One expert noted that if the group of districts with no referendum levy were to devote the same percentage of their personal income (i.e., face the same tax burden) to that levy as did the districts with an existing referendum levy, the districts without a referendum would raise 83.6% of the revenue raised by the districts with a referendum levy. This leaves only 16.4% attributable to differences in tax base.

Thus, while the plaintiffs' and intervenors' positions with respect to the tax base may seem to be wholly inconsistent, the particular ANTC property tax system employed in Minnesota indicates that their respective findings and conclusions are consistent, or at least are not mutually exclusive.

the referendum levy, supplemental revenue, debt service levy, and training and experience (T & E) statutes should be declared unconstitutional. While the trial court found for plaintiffs with respect to the first three programs, it declared the T & E statute constitutional, and this finding is not challenged on appeal to this court.

Currently, state funding is fully equalized for the approximately 93% of state funding attributable to the basic revenue formula. However, the remaining 7% of funding is not equalized and is often left to local control. The largest component of this additional funding is the referendum levy, and it comprises 6.3% of overall funding. Because this is the largest component of the non-equalized 7% and the one which has the greatest wealth disparity between districts, much of our analysis will focus on this factor. Nevertheless, we will briefly outline the current structure of each of the three funding programs—referendum levy, supplemental revenue, and debt service levy—challenged here on appeal.

### 1. *Referendum Levy*

The first form of unequalized revenue is the referendum levy. Such levies are specifically authorized by the Minnesota statutes under a section which defines and outlines the use of these levies by local districts. *See* Minn.Stat. § 124A.03 (1992). These levies permit local school districts to increase funding over that of the basic formula if voters approve a certain percentage increase in their property taxes.[6] Until 1991, none of the revenue generated by this levy was equalized, thereby providing high property tax base districts with more revenue than low property tax base districts for an equivalent rate increase.

The crux of the plaintiffs' claim is that these additional revenue sources which are above and apart from the wholly equalized basic formula result in wealth-based funding disparities among Minnesota school districts. The largest component of this additional funding is the referendum levy, which com-prises 6.3% of overall education financing. Plaintiffs' expert, Dr. Augenblick, testified that levy use has quadrupled between 1983–84 and 1991–92, that frequency and extent of levy use increases with the size of the tax base, and that high-wealth districts can obtain more revenue from unequalized levies at lower tax rates than low-wealth districts. In total, 184 of Minnesota's 435 districts had a referendum levy in 1983, raising an average of $205 ppu. By 1990–91, 278 districts were availing themselves of the referendum levy, and the average funding level had increased to $432 ppu.

Dr. Mueller also testified for plaintiffs about a study he conducted of 14 districts in which he paired seven intervenor districts with seven plaintiff districts. Mueller's study focused on only 14 of the 430 school districts in the state, but these paired districts were selected based on certain similar characteristics, such as location and school size. Of particular importance throughout the trial was the comparison between Edina and Elk River. The study revealed that Edina receives $1,334 ppu in levies, while Elk River generates only $113 ppu, despite the fact that both districts had approximately 6000 students. Even adjusting for other factors, Mueller's study estimated that Edina had an $837 ppu funding advantage over Elk River. Although Mueller's study did not fully adjust for cost factors or enrollment fluctuations, the court accepted his study as evidence of the large disparities which exist between districts.

Although these studies point to potential disparities, the intervenors challenged these findings and asserted that the results of the plaintiffs' experts are not necessarily dispositive. For example, Mueller's study failed to adjust fully for cost differences or the effects of enrollment changes. These factors become important, especially for the intervenor districts, which have suffered a relative population decline in comparison to the plaintiff districts. Recently, the intervenor districts have experienced declining enrollment, an

---

6. At the election, the ballot must mention the maximum amount of the increased revenue per actual pupil unit as well as the estimated referendum tax rate as a percentage of market value in the first levy year. It must also state that the revenue will be used to finance school operations. Minn.Stat. § 124A.03, subd. 2(a) (1992).

aging population base, and experienced teachers who command a high salary. Meanwhile, plaintiff districts have been growing, with population expanding and many young teachers being hired. State law requires that teachers with the least seniority be laid off first and, as enrollment stabilizes, that those with the most seniority be hired back first. Minn.Stat. § 125.17, subd. 11 (1992). This requirement, combined with the fact that administrative overhead costs are relatively fixed and are slow to adapt to declining enrollment, often causes cost reductions to lag substantially behind enrollment declines.

In addition, declining enrollment can, in and of itself, create additional fiscal pressure on those districts. As the California Supreme Court noted, "The immediate effect of declining enrollments, of course, is a lowered ADA [average daily attendance] and a corresponding reduction in state-provided foundation program money to the affected district. The cost of education due to declining enrollment does not decline in the same proportion." *Serrano v. Priest,* 18 Cal.3d 728, 135 Cal.Rptr. 345, 361 n. 34, 557 P.2d 929, 945 n. 34, *cert. denied,* 432 U.S. 907, 97 S.Ct. 2951, 53 L.Ed.2d 1079 (1977). Thus, declining enrollment, rather than inherent wealth advantages, may partially explain the disparities in referendum levy funding between districts.

Furthermore, various changes enacted by the 1991 legislature addressed the differences in referendum levy funding and have ensured that these disparities will not increase in future years. As part of these reforms, the referendum levy was capped and no new referenda may be sought for the 1992–93 school year. New levies may only be authorized for a five-year period, and they must be on a "per pupil unit" basis, which will effectively alter the amount raised as enrollment changes. Minn.Stat. § 124A.03 (1992). In addition, in the future, only market value, rather than the artificial measure of net tax capacity, will be used. Thus, future referenda will not be tied into the tax base. Finally, the new statute provides for partial equalization, which will help low tax base districts. One expert estimated that this equalization will direct between $40 and $100 million in state aid to low tax base districts by July 1995. While this new statute does not equalize all referendum revenue and does not affect existing permanent referenda, it will lead to increased equality.

Upon weighing the above evidence, the trial court agreed, in large part, with the conclusions of plaintiffs' experts. The court noted that while the levies themselves do not create classifications, they are based on property wealth-related characteristics which create disparities in educational opportunity among school districts. In addition to the increased use of such levies, the trial court found that there was a strong relationship between school district property wealth and both the use of the referendum levy and the amount of revenue derived therefrom. For example, 83% of the plaintiffs had no referendum levies or raised $200 or less ppu, while almost 80% of the intervenors had referendum levies in excess of $600. The trial court concluded that the increasing use of this funding source resulted in growing wealth-based revenue disparities in the Minnesota school finance system and was therefore unconstitutional.

### 2. Supplemental Revenue

The second component which plaintiffs claim is unconstitutional is the supplemental revenue provision. Supplemental revenue is part of the general education revenue statute, Minn.Stat. § 124A.22 (1992), and it comprises 0.3–0.5% of total education funding. Supplemental revenue is, however, completely equalized.

While supplemental revenue guarantees school districts $250 ppu more than they were guaranteed in 1987–88, this revenue was designed to prevent districts from experiencing revenue decline after the 1987 legislative reforms, especially those districts which experienced higher costs than other districts. This supplemental revenue program guaranteed that districts would receive $250 per pupil unit more than they received before the 1987 legislative changes. This program was intended to keep districts from suffering a sudden relative loss in operating revenue.

This program was not designed, however, to be an ongoing subsidy. Over time, supplemental revenue is gradually being phased out

as basic revenue increases. For any district that receives more than $250 ppu of this revenue, supplemental revenue will be decreased in the same amount as any increases the district receives in T & E or compensatory (AFDC) revenue, two components which were increased substantially by the 1991 legislature. *See* Minn.Stat. § 124A.22, subd. 8 (1992).

In evaluating this statute, the trial court found it unconstitutional because the court found that the revenue is more commonly available to high wealth districts, the level of funding is based on historical and political considerations, and, in conjunction with the referendum levy, the existence of this revenue creates even greater disparities between wealthy and poor school districts.

### 3. *Debt Service Levy*

The debt service levy, unlike the other two components, is outside the general education revenue fund. These levies, which must be approved by voters, are locally authorized taxes which are used to finance bonds for construction or renovation of school buildings. Minn.Stat. § 124.95 (1992).

The debt service levy also has a different effect on districts from the referendum levy and supplemental revenue because those latter components impact the year-to-year operating budgets of districts, whereas the debt service levy provides funding for construction of buildings which are paid for over time. The debt service levy is used to fund capital projects and is therefore determined by the demographic growth and decline cycle of districts rather than being related to the tax wealth of a district.

The trial court, although finding that the levy showed no patterns across tax base deciles, struck down this provision because it found that the effect of high debt service levies in low property tax base districts adversely affects that district's ability to generate referendum levy dollars. At the time the trial court struck down this provision in 1991, the debt service was wholly unequalized. In 1992, however, this program was funded and partially equalized. Act of April 29, 1992, ch. 499, art. 5, § 17, 1992 Minn.Laws 408, 449. The state also provides comprehensive aid for capital projects, with the state's capital expenditure revenue rising from $0.5 million in fiscal year 1988 to $108 million in 1991, and this revenue provides a fully equalized $195 ppu to districts for their general capital needs.

■ Thus, given the small portion that supplemental revenue accounts for in the overall state education budget (less than 0.5%), and the subsequent actions which have been taken to fund and partially equalize the debt service levy, we hold that these areas have been adequately addressed by the legislature and that any resulting disparities do not rise to the level of a constitutional violation. However, this still leaves unresolved the issue of whether, and to what extent, the referendum levy withstands constitutional scrutiny. Thus, the present funding systems in dispute must be analyzed under both the Education Clause and the equal protection clause of the Minnesota Constitution in order to determine whether the present system must be declared unconstitutional.

### I.

■ The first issue is whether the present education financing system in general, and the referendum levy statute in particular, must be declared unconstitutional under the Education Clause of the Minnesota Constitution. This Clause places a duty on the legislature to establish a general and uniform system of public education. Plaintiffs claim that this "uniformity" requirement is violated by the current education finance system because the current system leaves too much discretion with local officials and permits high wealth districts to generate much more additional funding than their low wealth and average wealth counterparts. Plaintiffs assert that this resulting funding differential violates the constitutional duty of uniformity.

In order to evaluate this claim, the structure and constitutional history of the Education Clause must be analyzed to determine the meaning of the word "uniform." In addition, an examination of case law from other states provides additional insight into the treatment of similar state constitutional provisions by other state courts.

The Education Clause is contained in Article XIII of the Minnesota Constitution, and it provides as follows:

> **Uniform system of public schools.** The stability of a republican form of government depending mainly upon the intelligence of the people, it is the duty of the legislature to establish a general and uniform system of public schools. The legislature shall make such provisions by taxation or otherwise as will secure a thorough and efficient system of public schools throughout the state.

Minn. Const. art. XIII, § 1 [hereinafter "Education Clause"].

In interpreting the meaning of the phrase "general and uniform system of public schools," constitutional history provides little guidance. Neither of the proposed drafts at the constitutional convention included the present language "general and uniform." Instead, the initial Republican version began, "The legislature shall . . . establish a system of common schools which shall be nearly uniform as practicable," while the Democratic proposal read, "It shall be the duty of the Legislature . . . to establish a general system of public schools." *The Debates and Proceedings of the Minnesota Constitutional Convention* 460 (1857). As initially proposed in the legislature, the Education Clause provided:

> Section 1. Wisdom and Knowledge, as well as Virtue, are essential to the preservation of rights and liberties of the people, therefore: It shall be the duty of the Legislature of this State to cherish the interests of Education in Literature and Science, and to establish a general system of Public Schools; to encourage public and private instruction for the promotion of Agriculture, Arts, Science, Commerce, Trade, Manufactories, and Natural History of the Country; and to adopt all means which they may deem necessary and proper to secure to the people the advantages and opportunities of Education.
>
> \*    \*    \*    \*    \*    \*
>
> Section 3. The Legislature shall make such provisions, by taxation or otherwise, as, with the income arising from the School Fund, will secure a thorough and efficient

system of Schools in each Township in the State.

*Id.* at 437–38. However, nowhere in these proposals is the phrase "general and uniform system" described.

By the time of the 1857 Minnesota Constitution, the provision had been modified slightly. In that document, the present Education Clause was divided into two separate sections, one addressing the establishment of a uniform system of public schools, and the other one outlining the financing of such schools. Specifically, the clause at that time provided:

> Section 1. **Uniform system of public schools.** The stability of a republican form of government depending mainly upon the intelligence of the people, it shall be the duty of the legislature to establish a general and uniform system of public schools.
>
> \*    \*    \*    \*    \*    \*
>
> Section 3. Public schools in each township to be established. The legislature shall make such provisions, by taxation or otherwise, as, with the income arising from the school fund, will secure a thorough and efficient system of public schools in each township in the State.

Minn. Const. art. VIII, §§ 1, 3 (1857 Constitution). An early case interpreting Article VIII, Section 1 noted that it was not a limitation on power but was instead an imposition of a duty to establish a general and uniform system of public schools. *Curryer v. Merrill,* 25 Minn. 1, 6–7 (1878). The court noted that this requirement did not, however, prohibit the legislature from creating other public schools, in addition to those included in the general system, or from creating exceptional districts to meet particular and exceptional cases. *Id.* at 6. The court also noted that the operation of common and independent school districts, or other schools specifically provided for, did not violate this constitutional provision. *Id.*

Plaintiffs contend that because some disparities exist in the 6–7% of total education revenue generated by local referendum levies, these levies should be held unconstitu-

tional under the "general and uniform" language of the Education Clause. However, two factors militate against such a finding: (1) the broad interpretation given to the phrase "general and uniform" by this and other state courts, and (2) the relatively small disparity in funding, combined with plaintiffs' admission that all schools in the state are able to provide an adequate education.

Plaintiffs claim that because the referendum levy creates some unequal funding levels, it violates the uniformity requirement of the constitution. In so doing, plaintiffs appear to narrowly construe the word "uniform" so that it practically means "identical," at least as it relates to financing. They claim that because the referendum levy creates some unequal funding levels, it violates the uniformity requirement of the constitution.

Although the phrase "general and uniform" has not been directly construed by this court, early Minnesota cases indicated that this provision should be broadly interpreted. In 1878, we stated:

> The rule of uniformity contemplated by this constitutional provision which the legislature is required to observe, has reference to the *system* which it may provide, and not to the district organizations that may be established under it. These may differ in respect to size, grade, corporate powers and franchises, as may seem to the legislature best * * * but the principle of uniformity is not violated, if the *system* which is adopted is made to have a general and uniform application to the entire state, so that the same grade or class of public schools may be enjoyed by all localities similarly situated, and having the requisite conditions for that particular class or grade.

*Curryer*, 25 Minn. at 6 (emphasis added). In summarizing the purposes behind this provision, we noted:

> The object [of these provisions] is to insure a regular method throughout the state whereby all may be enabled to acquire an education which will fit them to discharge intelligently their duties as citizens of the republic. The present general laws respecting public schools, it is not denied,

answer these requirements of the constitution.

*Board of Education of Sauk Centre v. Moore*, 17 Minn. 412, 416, 17 Gil. 391, 394 (1871).

Other state courts which have faced similar challenges to constitutional provisions have indicated that "uniform" merely applies to the general system, not to specific funding disparities. The Oregon court stated that the "uniform" language is "complied with if the state requires and provides for a minimum of educational opportunities in the district and permits the districts to exercise local control over what they desire, and can furnish, over the minimum." *Olsen v. State*, 276 Or. 9, 554 P.2d 139, 148 (1976).

A recent Wisconsin case stated that "uniform" referred to such items as minimum standards for teacher certification, minimal number of school days, and standard school curriculum. *Kukor v. Grover*, 148 Wis.2d 469, 436 N.W.2d 568, 577–78 (1989). The *Kukor* court noted that the state assures compliance with these standards by providing sanctions if districts are not in compliance. *Id.* 436 N.W.2d at 578. An Idaho case provided a similar interpretation, noting that a "general and uniform" system is one which, within reasonable constitutional limits of equality, makes ample provision for the education of all. *Thompson v. Engelking*, 96 Idaho 793, 537 P.2d 635, 652 (1975).

Similar interpretations for "thorough and efficient" have been promulgated. For example, a West Virginia court defined a "thorough and efficient system" as follows:

> It develops, as best the state of education expertise allows, the minds, bodies and social morality of its charges to prepare them for useful and happy occupations, recreation and citizenship, and does so economically.
>
> Legally recognized elements in this definition are development in every child to his or her capacity of (1) literacy; (2) ability to add, subtract, multiply and divide numbers; (3) knowledge of government to the extent that the child will be equipped as a citizen to make informed choices among persons and issues that affect his own gov-

ernance; (4) self-knowledge and knowledge of his or her total environment to allow the child to intelligently choose life work—to know his or her options; (5) work-training and advanced academic training as the child may intelligently choose; (6) recreational pursuits; (7) interests in all creative arts, such as music, theatre, literature, and the visual arts; (8) social ethics, both behavioral and abstract, to facilitate compatibility with others in this society.

*Pauley v. Kelly,* 162 W.Va. 672, 255 S.E.2d 859, 877 (1979).

Thus, these definitions all focus on the broad purposes of an education system and emphasize that such a standardized system be established throughout the state. In addition, this court must read the terms "general and uniform" to be *in pari materia.* Construing "uniform" as meaning "identical" (or "nearly identical") would be inconsistent with a plain reading of the Education Clause as well as this court's and other state court's interpretation of similar phrasing.

In addition, none of the state cases cited above has required complete funding equalization; in fact, most of these cases have explicitly stated that local funding levies would be permissible as long as the underlying basic needs have been met. The fact that plaintiff districts are receiving an adequate level of basic education is the primary distinguishing feature between plaintiffs' claim and those cases from other states in which a funding scheme has been found to violate a state constitutional provision. In every case from another state in which a violation of a state constitutional provision was found, there were inadequacies in the levels of *basic* funding, and, consequently, a deficient overall level of education.

For example, in *Helena Elementary Sch. Dist. No. 1 v. State,* 236 Mont. 44, 769 P.2d 684 (1989), the state constitution of Montana stated that "[e]quality of educational opportunity is *guaranteed* to each person of the state." *Id.* 769 P.2d at 689 (emphasis added). Despite this requirement, similar school districts had funding disparities as high as 8 to 1, and 35% of all general fund budgets were obtained from additional levies by local

school districts (compared to the 6–7% in this case). *Id.* at 686. Based on this evidence, the *Helena* court found that the state had failed to fund adequately the foundation program. *Id.* at 690.

In *Seattle Sch. Dist. No. 1 of King County v. State,* 90 Wash.2d 476, 585 P.2d 71 (1978), the Washington Supreme Court determined that a "general and uniform system" had not been established because the funding for "basic education" was not derived from "dependable and regular" tax sources. *Id.* 585 P.2d at 97. Instead, the complaining district was required to raise 37.7% of its "maintenance and operations" revenues through a special excess levy. *Id.* at 98. The court concluded: "We hold that any statutory scheme which authorizes the use of special excess levies to discharge the State's paramount duty of making ample provision for 'basic education' or a basic program of education is not the dependable and regular tax source required to comply with Const. art. 9, §§ 1 and 2." *Id.* at 99.

Likewise, in *Rose v. Council for Better Educ., Inc.,* 790 S.W.2d 186 (Ky.1989), the Kentucky Supreme Court held that the state's education funding system did not meet the constitutional requirement of an "efficient system of common schools" because the overall system was inadequate, lacking in uniformity, and discriminatory as to the children served in 80% of the local school districts. *Id.* at 198.

In *Abbott v. Burke,* 119 N.J. 287, 575 A.2d 359 (1990), the New Jersey funding system was struck down because districts at the fifth percentile spent $2,687 ppu, while those at the ninety-fifth percentile spent $4,755 ppu. *Id.* 575 A.2d at 383. The court noted that poor urban districts were getting an inadequate education and that the funding mechanism would equalize only about 64% of the districts if fully funded. *Id.* at 370.

The disparities in *Edgewood Indep. Sch. Dist. v. Kirby,* 777 S.W.2d 391 (Tex.1989), may have been the most egregious of all. In that case, there was a 700 to 1 ratio between the value of taxable property in the wealthiest and poorest districts. State funding only accounted for 42% of overall funding, and

local district spending varied from $2,112 to $19,333 per student. *Id.* at 392. This system, not surprisingly, was held to violate the state constitutional requirement of "an efficient system of public free schools." *Id.* at 393.

Furthermore, in many of these other cases, even some in which the educational systems were ultimately declared unconstitutional, the courts noted that discretionary levies by local districts would be permitted if the baseline level of providing an adequate or efficient system of education was first achieved. The *Edgewood* court noted that the establishment of an efficient system of public free schools

> does not mean that the state may not recognize differences in area costs or in costs associated with providing an equalized educational opportunity to atypical students or disadvantaged students. Nor does it mean that local communities would be precluded from supplementing an efficient system established by the legislature; however any local enrichment must derive solely from local tax effort.

*Id.* at 398; *see also Olsen*, 554 P.2d at 148 (allowing districts to exercise local control once the baseline has been met).

Thus, the present situation is readily distinguishable from other state cases in which the educational finance system has been found unconstitutional. Unlike those cases, plaintiffs here are unable to establish that the basic system is inadequate or that the "general and uniform" requirement somehow implies full equalization of local referendum levies. Any inequities which exist do not rise to the level of a constitutional violation of the state constitutional provisions which require the state to establish a "general and uniform system of public schools" which will secure a "thorough and efficient system of public schools," especially when the existing system continues to meet the basic educational needs of all districts. Thus, we hold that the present system of educational financing of public education does not violate the "general and uniform system of public schools" of the Education Clause of the Minnesota Constitution.

## II.

In addition to claiming that the statutes should be declared unconstitutional under the Education Clause, plaintiffs also assert that the challenged statutes violate the Minnesota Equal Protection Clause. This clause provides:

> No member of this state shall be disenfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers. * * * *

Minn. Const. art. I, § 2. This court has recognized that the standard applied to claims brought under the state equal protection clause is the same as that applied to claims brought under the federal equal protection clause. *AFSCME Councils 6, 14, 65 & 96 v. Sundquist*, 338 N.W.2d 560, 569 n. 11 (Minn.1983), *appeal dismissed*, 466 U.S. 933, 104 S.Ct. 1902, 80 L.Ed.2d 452 (1984).

Under general principles of constitutional adjudication, a statute is presumed valid, and the duty is on the challenging party to prove its invalidity. *Essling v. Markman*, 335 N.W.2d 237, 239 (Minn.1983). This court will not substitute its judgment for that of the legislature, and if the record indicates that the statute is rationally related to the achievement of a legitimate government purpose, it will be upheld. *Id.* (*citing Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 124, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91 (1978)).

This burden of proof can shift to the state in constitutional challenges if the challenged statute operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution. In general, if either of these conditions exist, strict scrutiny will apply, and the state will have to prove that the statute is necessary to a compelling government interest. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973); *Essling*, 335 N.W.2d at 239. Thus, this court must determine whether there is a fundamental right or suspect class involved and whether the referendum levy would survive a constitutional challenge under the applicable legal standard.

Under the United States Constitution, the *Rodriguez* case has clearly established that education is *not* a fundamental right under federal law, despite its overall importance. 411 U.S. at 33, 37–38, 93 S.Ct. at 1296, 1299. Because education is not explicitly or implicitly protected under the United States Constitution, the Supreme Court determined that it is not a fundamental right. *Id.* at 35, 93 S.Ct. at 1298. Therefore, the state's system under *Rodriguez* only needed to bear some rational relationship to legitimate state purposes. *Id.* at 40, 93 S.Ct. at 1300. Because the state met this standard, the Court held that the school system in Texas did not violate the federal equal protection clause. *Id.* at 55, 93 S.Ct. at 1308.

Although education is not a fundamental right under the federal constitution, it may still be a fundamental right or constitutional entitlement under the Minnesota Constitution. This court has recognized that fundamental rights are "[t]hose which have their origin in the express terms of the Constitution or which are necessarily to be implied from those terms." *State v. Gray*, 413 N.W.2d 107, 111 (Minn.1987) (*quoting Black's Law Dictionary* 607 (5th ed. 1979)). We have noted that Minnesota is not limited by the United States Supreme Court and can provide more protection under the state constitution than is afforded under the federal constitution. *Id.*

■ In this case, the determination of whether education is a fundamental right under the Minnesota Constitution is a close question. While the state claims that *Gray* only recognizes "fundamental right" status for those mandates found in the Bill of Rights, not in other parts of the constitution, *Gray* does not appear to place any such limits on finding a fundamental right. Instead, *Gray* merely requires that a fundamental right be found in or implied from the terms of the state constitution. *Gray*, 413 N.W.2d at 111.

The state and intervenors suggest that if this court were to find that education is a fundamental right based solely on the mandatory language found in the Education Clause, then all other provisions in the constitution which contain mandatory language,

such as "shall" or "must," would also have to be considered fundamental rights. This analysis would lead to the conclusion that there is a fundamental right to a trunk highway system since that constitutional provision says that the state "shall" construct and maintain a trunk highway system. *See* Minn. Const. art. XIV, § 2.

However, the Education Clause not only contains language such as "shall" but in fact places a "duty" on the legislature to establish a "general and uniform system" of public schools. This is the only place in the constitution where the phrase "it is the duty of the legislature" is used. This, combined with the sweeping magnitude of the opening sentence of the Education Clause—"The stability of a republican form of government depending mainly upon the intelligence of the people, it is the duty of the legislature to establish a general and uniform system of public schools"—provides further support for holding education to be a fundamental right.

Thus, on balance, we hold that education *is* a fundamental right under the state constitution, not only because of its overall importance to the state but also because of the explicit language used to describe this constitutional mandate. While a fundamental right cannot be found "[a]bsent constitutional mandate," *Rodriguez*, 411 U.S. at 33, 93 S.Ct. at 1296, the Education Clause *is* a mandate, not simply a grant of power. *Associated Schs. of Indep. Dist. No. 63 v. School District No. 83*, 122 Minn. 254, 258, 142 N.W. 325, 327 (1913).

The conclusion that education is a fundamental right has also been recognized by other states with similar constitutional provisions. In *Seattle Sch. Dist.*, the Washington Supreme Court noted that the statute placed a "paramount duty" on the state to provide ample education. 585 P.2d at 91. The court noted that this is the "*declaration* of the State's social, economic and educational *duty* as distinguished from a mere policy or moral *obligation*," and that, "[f]lowing from this constitutionally imposed 'duty' is its jural correlative, a correspondent 'right' permitting control of another's conduct." *Id.* (emphasis in original) (footnotes omitted). Likewise, the Wisconsin Supreme Court, in evaluating a constitutional provision which is simi-

lar to, but perhaps weaker than, Minnesota's Education Clause,[7] held that "equal opportunity for education" is a fundamental right. *Kukor*, 436 N.W.2d at 579. Similarly, Wyoming's requirement of "thorough and efficient" schools was regarded as leaving "no room for any conclusion but that education for the children of Wyoming is a matter of fundamental interest." *Washakie County Sch. Dist. No. 1 v. Herschler*, 606 P.2d 310, 333 (Wyo.), *cert. denied*, 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980).[8]

Thus, our conclusion that education is a fundamental right is amply supported by other state courts which have interpreted similar constitutional provisions.

■ The second way in which courts may apply strict scrutiny to a challenged statute is to find that the challenged statute has burdened a suspect class. The trial court found that wealth was a suspect class with respect to these statutes, and other courts have reached similar results. *See Washakie County*, 606 P.2d at 334 (holding that a classification on the basis of wealth is considered suspect, especially when applied to fundamental interests such as education); *Serrano*, 135 Cal.Rptr. at 367, 557 P.2d at 951 ("discrimination in educational opportunity on the basis of district wealth involves a suspect classification"). In those cases, however, the apparent disparities were far greater than the present case and the plaintiffs were relatively powerless, thereby facilitating a "suspect class" finding. *See Washakie County*, 606 P.2d at 329 (noting that the assessed valuation varied at a ratio of 21 to 1, and total revenue varied as much as $2,500 per student).

When basic revenues are provided, however, and wide differentials in revenue do not exist, it is more difficult to find that wealth is a suspect class. As noted by *Rodriguez*, the disadvantaged class in these school funding cases is generally not susceptible to being classified as a "suspect class" due to the absence of any evidence that the financing system discriminates against any definable category of "poor" people or that it results in the absolute deprivation of education. *Rodriguez*, 411 U.S. at 25, 93 S.Ct. at 1292. Given these conditions, respondents probably would not be a "suspect class." As one court noted:

> [T]he alleged "class" of low-income persons constitutes an incredibly amorphous group, a group which changes over time and by context, and which is unable to show the historical pattern of discrimination that traditional "suspect" classes can.

> In *Rodriguez*, the court reiterated the traditional features of suspectness: namely, (1) that the class is either subjected to a history of purposeful unequal treatment with its attendant disabilities, or (2) it is relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process. It is evident in this case that appellees do not satisfy either of these indicia of suspectness.

*Lujan v. Colorado State Bd. of Educ.*, 649 P.2d 1005, 1021 (Colo.1982).

In the present case, plaintiffs are unable to demonstrate that they have been subject to a history of purposeful unequal treatment or that they have been relegated to a position of political powerlessness. Furthermore, the Minnesota Constitution does not require strict economic equality under the equal protection clause. Thus, plaintiffs do not qualify as a suspect class.

Nevertheless, the absence of a suspect class does not necessarily affect the strict scrutiny test because strict scrutiny applies if there is *either* a fundamental right or a suspect class. Thus, this court must determine if the state constitution's fundamental right to a "general and uniform system of education" has been met and whether that fun-

---

7. Under the Wisconsin Constitution, the legislature was directed to provide district schools, "which shall be as nearly uniform as practicable." *Kukor*, 436 N.W.2d at 574.

8. For other cases holding that education is a fundamental right, see *Horton v. Meskill*, 172 Conn. 615, 376 A.2d 359, 373 (1977); *Pauley v.* *Kelly*, 162 W.Va. 672, 255 S.E.2d 859, 878 (1979); *Rose v. Council for Better Education, Inc.*, 790 S.W.2d 186, 206 (Ky.1989); *Serrano v. Priest*, 18 Cal.3d 728, 135 Cal.Rptr. 345, 367, 557 P.2d 929, 951 (1976), *cert. denied*, 432 U.S. 907, 97 S.Ct. 2951, 53 L.Ed.2d 1079 (1977).

damental right extends to the financing of the public schools. In doing so, we must look to the structure of the state constitution as well as applicable case law to determine the appropriate standard to apply in evaluating the constitutionality of Minnesota's educational funding system.

■ The structure and history of the Minnesota Constitution indicates that while there is a fundamental right to a "general and uniform system of education," that fundamental right does not extend to the *funding* of the education system, beyond providing a basic funding level to assure that a general and uniform system is maintained. The Minnesota Constitution of 1857 created the fundamental right to education by providing, in Article VIII, Section 1, that it is the "duty of the legislature to establish a general and uniform system of public schools." Meanwhile, an entirely different section, Article VIII, Section 3, stated that the legislature "shall" [9] provide taxes to "secure a thorough and efficient system." Thus, a clear reading of the original constitution indicates that the drafters intended to draw a distinction between the fundamental right to a "general and uniform system of education" and the financing of the education system, which merely must be "thorough and efficient." The fact that the drafters distinguished between the creation and financing of the education system provides a constitutional basis for distinguishing between the establishment of a *general and uniform system* of public schools and the *financing* of those schools. Thus, the evidence indicates that while strict scrutiny analysis should be applied in determining whether the legislature has met a student's fundamental right to a general and uniform *system* of public schools, a lesser standard, such as a rational basis test, should apply to the determination of whether the *financing* of such a system is "thorough and efficient."

In this case, the available evidence suggests that the right of the people of Minneso-

ta to an education is sui generis and that there is a fundamental right, under the Education Clause, to a "general and uniform system of education" which provides an adequate education to all students in Minnesota. In evaluating a challenge to such a fundamental right, this court must employ the strict scrutiny test. Under that test, a law will be upheld only if it is necessary to serve a compelling governmental interest. *See Essling*, 335 N.W.2d at 239.

■ In this case, the plaintiffs concede that they continue to receive an adequate education, thereby satisfying the fundamental right to a general and adequate system of education. With respect to uniformity, the funding system in question provides the same amount of funding for each student. The equalization process the state uses to arrive at the basic revenue figure meets, if not exceeds, the constitutional requirements of a "general and uniform" system of public schools. Because the present system provides uniform funding to each student in the state in an amount sufficient to generate an adequate level of education which meets all state standards, the state has satisfied its constitutionally-imposed duty of creating a "general and uniform system of education." Therefore, the state's present system of education withstands strict scrutiny analysis.

Once this baseline level of adequacy and uniformity has been established, however, this court will not strike down the legislature's *financing* of such a system unless the resulting disparities dilute the adequacy of the constitutional entitlement to a "general and uniform system" of education. Because the state constitution does not require strict economic equality under the equal protection clause, it cannot be said that there is a "fundamental right" to any particular funding scheme, although, as we said above, there is a fundamental right to the basic level of funding needed to achieve a general and uniform education system. Where the state

9. Thus, in 1857, the constitution merely used the word "shall" in describing the legislature's duty to provide financing, through taxation or otherwise, to fund a thorough and efficient system of schools. In contrast, the "duty of the legislature" language was used only in Section 1 of Article VIII, which addressed the establishment of the schools. Thus, the language used in the section on financing the schools differed from, and perhaps imposed a lesser duty than, the language in Section 1.

constitution merely requires that the funding of education "secure a thorough and efficient system"; the particular means employed to finance state education are left to the legislature's determination. Thus, we believe that challenges to the state's *financing* of education beyond what is necessary to provide an adequate level of education which meets all state standards must be evaluated, not under strict scrutiny, but rather under the rational basis test, and we will not set aside the legislature's determination unless the funding system employed somehow impinges upon the adequacy with which the state meets the fundamental right to a general and uniform education.

■ Under the rational basis test, legislative classifications will be upheld if they are at least rationally related to a legitimate state interest. *In re Harhut,* 385 N.W.2d 305, 310 (Minn.1986). It must only be shown (1) that there was a legitimate purpose for the challenged legislation, and (2) that it was reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose. *Western & Southern Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. 648, 668, 101 S.Ct. 2070, 2083, 68 L.Ed.2d 514 (1981).

■ The present system clearly satisfies the rational basis test. The challenged statutes provide an adequate level of education to all students, and local districts merely have the capacity to supplement these amounts once the baseline level of funding has been provided. The state has a legitimate interest in encouraging local districts to supplement the basic revenue component, and allowing localities to augment the state contribution is rationally related to furthering this goal and is one which sufficiently balances the competing goals which have challenged and troubled states and municipalities throughout their history. As the Supreme Court noted in *Rodriguez,* "The history of education since the industrial revolution shows a continual struggle between two forces: the desire by members of society to have educational opportunity for all children, and the desire of each family to provide the best education it can afford for its own children." 411 U.S. at 49, 93 S.Ct. at 1305 (*quoting* J. Coleman, *Forward* to G. Strayer & R. Haig, *The Financing of Education in the State of New York* (1923)).

Many other state courts, when confronted with similar challenges to state education funding statutes, have followed a similar analysis and have held that although education is a fundamental right, some lesser level of scrutiny, such as the rational basis test, should apply in evaluating the constitutionality of the *financing* of the educational system. For example, the Wisconsin court, in *Kukor,* recognized that "equal opportunity for education" is a fundamental right, but it concluded that this finding did not mandate absolute equality in financing, even if certain districts lacked funds to provide specialized programs or to meet needs of certain impoverished children. 436 N.W.2d at 579. In reaching this conclusion, the *Kukor* court noted that the equalization system of the financing statutes actually resulted in more uniformity than that required under the constitutional provision in Article X of the Wisconsin Constitution:

> The present equalization system *far exceeds the degree of uniformity which might be accomplished under the constitutional provision:* whereas the constitution provides only for each district to receive an equal amount of state resources per pupil, ch. 121, Stats., provides a greater amount of state funds per pupil to districts with lower equalized property valuations. The general aid formula operates to assure that all districts will be able to provide for the basic education of its pupils, regardless of property wealth, at a cost slightly higher than the average state cost per pupil of the previous year * * * *. [T]o the extent that the needs of a district exceed that cost ceiling, in addition to categorical grants, supplemental "secondary aid" may be available to districts with relatively low property valuation.

*Id.* at 577 (emphasis added). The court later continued this line of reasoning in concluding that strict scrutiny should not be applied to funding disparities:

> Moreover, to the extent that art. X delineates state distribution of resources on an equal per-pupil basis, to assert that

equal opportunity for education mandates an entirely different scheme of financing requiring the state to distribute resources unequally among students to respond to the particularized needs of each student is inconsistent with the intent evidenced in the express language of art. X. Accordingly, since the deficiency allegedly exists not in the denial of a right to attend a public school free of charge, nor in the less affluent districts' failure to meet the educational standards delineated under sec. 121.02, Stats., nor in the state's failure to distribute state resources to the less affluent districts on at least an equal per-pupil basis as distribution is made to wealthier districts, *no fundamental right is implicated in the challenged spending disparity.*

*Id.* at 579 (emphasis added). The court then applied the rational basis test because the claims at issue were based on spending disparities, not on a denial of educational opportunity within the scope of Article X. *Id.* at 580. Although the court found that the state's interest in local control[10] provided such a rational basis, the court noted that it would usually, but not always, defer to the legislature on such matters:

> While our deference would abruptly cease should the legislature determine that it was "impracticable" to provide to each student a right to attend a public school at which a basic education could be obtained, or if funds were discriminatorily disbursed and there existed no rational basis for such finance system, we will otherwise defer to the legislature's determination of the degree to which fiscal policy can be applied to achieve uniformity. Consequently, we hold * * * that in the present case there is a rational basis justifying any disparities in per-pupil expenditures resulting from the operation of ch. 121, Stats., the rational basis being the preservation of local con-

trol over education as mandated by art. X of the Wisconsin Constitution.

*Id.* at 582 (footnote omitted).

The Connecticut Supreme Court explained the rationale behind imposing a lower standard than strict scrutiny when evaluating financing statutes: "The wealth discrimination found among school districts differs materially from the usual equal protection case where a fairly defined indigent class suffers discrimination to its peculiar disadvantage. The discrimination is relative rather than absolute." *Horton v. Meskill,* 195 Conn. 24, 486 A.2d 1099, 1105 (1985). The *Horton* court noted that because educational funding was "in significant aspects sui generis," strict scrutiny could not be applied. *Id.*

The Washington Supreme Court also found that although there was a fundamental right to education, the strict scrutiny test did not apply. In that case, the court found that Article 9, Section 1 created a fundamental right to education because it provided that it was the "paramount duty" of the state to make "ample provision" for education. *Seattle Sch. Dist.,* 585 P.2d at 95. However, because a separate section, Article 9, Section 2, governed the funding,[11] the court found that this provision merely required the legislature to provide "basic education" rather than some "total education" or other educational programs, subjects, or services which might be offered. 585 P.2d at 95. The court stated, "While the Legislature must *act* pursuant to the constitutional mandate to discharge its duty, the general authority to select the *means* of discharging that duty should be left to the Legislature." *Id.* at 96 (emphasis in original). The only duty the court placed on the legislature was the duty to fund the "basic education" component with dependable and regular tax sources. *Id.*

Finally, cases which have struck down educational financing systems under state equal protection clauses have involved either wide

---

**10.** Unlike Minnesota's constitutional provision, Wisconsin's Article X specifically provides for local school districts. This difference, however, is probably not significant in light of *Curryer*'s approval of the use of local school districts in Minnesota. *Curryer,* 25 Minn. at 6–7.

**11.** In that section, the legislature was required to provide a "general and uniform system of public schools." *Seattle Sch. Dist.,* 585 P.2d at 95.

disparities in funding or outright inadequacies, neither of which exists in the present case. *See Washakie County,* 606 P.2d at 329 (a ratio of 21 to 1 in terms of assessed value between districts and funding disparities per student ranging from $1,600 to $4,300); *Dupree v. Alma Sch. Dist. No. 30,* 279 Ark. 340, 651 S.W.2d 90, 91 (1983) (local funding accounted for over 38% of funding); *Serrano,* 135 Cal.Rptr. at 353 n. 17, 557 P.2d at 937 n. 17 (wealthy districts had up to 1⅝ (1.625) times the amount available to poorer districts). In contrast, this case involves a basic level of funding which is adequate, and available case law on educational finance systems suggest that while a basic substantive level must be provided to all students, local districts can have the capacity to supplement those amounts. The New Jersey court noted that a certain *substantive level* of education must be achieved, but that local districts can go beyond that amount:

> The State's obligation to attain that minimum is absolute—any district that fails must be compelled to comply. If, however, that level is reached, the constitutional mandate is fully satisfied regardless of the fact that some districts may exceed it. In other words, the Constitution does not mandate equal expenditures per pupil. We implied that the level can—and should—be defined in terms of substantive educational content. But while disparity was explicitly permitted, there was a caveat—the excess spending could not somehow be allowed to mask a failure to achieve thoroughness and efficiency in other districts.

*Abbott v. Burke,* 575 A.2d at 369. The decisions cited above also reflect, in part, the courts' view that the determination of education finance policy, in the absence of glaring disparities, must be a legislative decision because it involves balancing the competing interests of equality, efficiency, and limited local control.

In sum, the State of Minnesota provides an adequate and uniform education which meets all state standards. It merely allows localities to augment this basic amount. While some students may ultimately have more money spent on their educations because they live in districts which are either wealthier or choose to spend a larger portion of their tax revenues on education, we do not believe that this funding scheme infringes a fundamental right or impacts on a suspect class, particularly where the United States Supreme Court has not deemed economic classifications to be suspect classes within the meaning of the Equal Protection Clause. *See Rodriguez,* 411 U.S. at 28, 93 S.Ct. at 1294. Furthermore, while wealth may play a factor in whether a district will be willing and able to augment the state funding, it is clearly not the only factor.

In this case, because the state's portion of the funding is equally distributed—and admittedly provides the funding for an adequate education—we believe that the present system of education funding withstands constitutional scrutiny. The method the legislature has chosen is narrowly tailored to the end of having as much money spent on education as is feasible, while at the same time providing a funding floor beneath which the education of any individual student may not sink. It is important to note that "adequacy" as used here refers not to some minimal floor but to the measure of the need that must be met. In this case, where the funding is "more than adequate," such a system satisfies the constitutional requirement.

The dissent argues that by holding the current funding system constitutional, we deprive future generations of Minnesotans of the right to an adequate education. That is not what our decision does. Rather, it requires the state to provide enough funds to ensure that each student receives an adequate education and that the funds are distributed in a uniform manner. The statutes in question accomplish this goal.

In holding that the present education funding system is constitutional, we do not mean to suggest that it would be impossible to devise a fairer or more efficient system of educational financing. Instead, we believe that any attempt to devise such a system is a matter best left to legislative determination. We merely hold that the present system withstands constitutional scrutiny. We agree with the Colorado Supreme Court, which summarized the concerns facing state courts

in evaluating similar constitutional challenges when it stated:

> [W]hether a better financing system could be devised is not material to this decision, as our sole function is to rule on the constitutionality of our state's system. This decision should not be read to indicate that we find Colorado's school finance system to be without fault or not requiring further legislative improvements. Our decision today declares only that it is constitutionally permissible.

*Lujan v. Colorado State Bd. of Educ.*, 649 P.2d at 1025. The United States Supreme Court also echoed many of these same concerns in its *Rodriguez* decision:

> We hardly need add that this Court's action today is not to be viewed as placing its judicial imprimatur on the status quo. The need is apparent for reform in tax systems which may well have relied too long and too heavily on the local property tax. And certainly innovative thinking as to public education, its methods, and its

funding is necessary to assure both a higher level of quality and greater uniformity of opportunity. These matters merit the continued attention of the scholars who already have contributed much by their challenges. But the ultimate solutions must come from the lawmakers and from the democratic pressures of those who elect them.

*Rodriguez*, 411 S.Ct. at 58–59, 93 S.Ct. at 1309–1310.

In the present case, we believe that the legislature has done an excellent job of balancing the competing interests inherent in designing an education funding system and has, on many occasions, taken significant steps to reduce any inequities.[12] Educational finance is a delicate area which, like the ebb and flow of a river, is in a constant state of flux. We believe that the state legislature has reacted fairly and intelligently to these fluctuating conditions and has attempted to meet the ever-changing needs of all school districts throughout the state.[13]

12. For example, after this case was heard, the 1993 legislature made significant changes in the statutes which are at issue in this lawsuit, changes which further reduce the disparity between the intervenor and plaintiff districts. In particular, the 1993 legislature made significant changes in the referendum levy and the supplemental revenue statutes. Act of May 17, 1993, ch. 224, 1993 Minn.Laws 647 ("Chapter 224"). With respect to the supplemental revenue statute, the 1993 legislature expanded and accelerated the phase-out process so that the amount of supplemental revenue per pupil unit for fiscal year 1994 and beyond is frozen at the amount of fiscal year 1993 supplemental revenue. Chapter 224, art. I, § 16. In addition, the 1993 legislature introduced a "Supplemental Revenue reduction" which further limits the scope of supplemental revenue. For districts that will be entitled to supplemental revenue, the amount received will first be reduced on a dollar-for-dollar basis equivalent to the amount that the basic revenue formula allowance is increased above the fiscal year 1993 level of $3,050 ppu. Chapter 224, art. I, § 17. Since the formula allowance for fiscal year 1995 and subsequent years is set at $3,150, Chapter 224, art. I, § 12, all districts which will be entitled to receive supplemental revenue in an amount of $100 ppu or less will have all of their supplemental revenue eliminated as an off-set to the increase in the formula allowance. Any district which is entitled to receive more than $100 ppu in supplemental revenue would have $100 of that revenue amount reduced as an off-set. The net result of these changes will be a sharp reduction in the number

of districts receiving supplemental revenue in fiscal year 1995 compared to fiscal year 1994, and a sharp reduction in the amounts received.

The 1993 legislature also made substantial changes in the referendum levy. Specifically, the legislature made four changes in the referendum levy which address areas in which the trial court found constitutional flaws. In summary, these changes: (1) increase state referendum levy equalization aid to low tax base districts which have referendum levies, see Chapter 224, art. I, §§ 8–9; (2) lower the cap on the referendum levy and initiate a process to reduce the referendum levy amounts for many districts, including those above the cap, see Chapter 224, art. I, § 7; (3) eliminate the category of permanent referendum levies, see Chapter 224, art. I, § 37; and (4) require all referendum levies to be spread against the value of property in a comparable manner, see Chapter 224, art. I, § 37.

Thus, the legislature has already taken significant action in attempting to equalize any disparities which may exist in the present funding system.

13. Testimony at trial revealed the fleeting nature of district wealth. One expert's study suggested that of the 44 districts in the highest wealth decile in 1983–84, only eight were in the highest decile after five years, and 16 of the 44 were not even in the highest three deciles. Thus, these rankings suggest that the tax capacity or wealth of a district is not an immutable characteristic but in fact fluctuates over time. The legislature

Thus, while the present system may not be perfect, we conclude that it clearly satisfies the state's constitutional duty to provide a "general and uniform system of education" to all students in the state. We therefore hold that the challenged statutes are constitutional under both the Education Clause and the equal protection clause of the Minnesota Constitution.

Reversed.

TOMLJANOVICH, Justice (concurring specially).

I agree with the judgment of the majority, but not its reasoning.

The majority concludes that the structure and the words of the state constitution indicate that public education is a right of fundamental importance. I agree with this conclusion. As the dissent properly points out, when a fundamental right is at issue, we are to apply strict scrutiny analysis, not rational basis analysis. I believe that the funding decision the legislature has made in the statute before us survives strict scrutiny analysis.

The question in this case essentially is whether it is constitutionally proper for the state legislature to allow local governments to augment the funding for public education provided by the state. The fundamental right conferred by the state constitution is to "a general and uniform" education. The plaintiffs in this case do not argue that they receive inadequate educations. Thus the question before us is whether the education funding system is "uniform" within the meaning of the state constitution.

Under the funding system in question, the state provides the same amount of funding for each student. Thus, I believe the state is fulfilling its constitutionally imposed duty to provide a uniform system of education for Minnesota's students attending public schools.

In applying strict scrutiny analysis the state must have a compelling interest and must choose a narrowly drawn method of achieving that end. I believe the state has a compelling interest in encouraging additional public money to be spent on education. Allowing localities to augment the state contribution is a carefully crafted method furthering this goal. This means, of course, that some students ultimately have more money spent on their educations because they live in districts which are either wealthier or choose to spend a larger portion of their tax revenues on education. As I have explained, I do not believe that this funding scheme infringes a fundamental right. Nor does it impact on a suspect class. As the majority explains, the United States Supreme Court has not deemed economic classifications to be suspect classes within the meaning of the Equal Protection Clause. Furthermore, while wealth may play a factor in whether a district will be willing and able to augment the state funding, it is clearly not the only factor.

In sum, the state provides an adequate and uniform education, which it allows localities to augment. Because the state's portion of the funding is equally distributed—and provides the funding for an adequate education—I believe the requirements of strict scrutiny have been met. The method the legislature has chosen is narrowly tailored to the end of having as much money spent on education as is feasible while at the same time providing a funding floor beneath which the education of any individual student may not sink.

I concur in the judgment of the court.

PAGE, Justice (concurring in part, dissenting in the judgment).

I respectfully dissent. I believe that, because education is a fundamental right under the Minnesota Constitution, the state's duty toward its children is not satisfied unless it provides equal educational opportunities for all children. This duty is not satisfied when some children receive an "adequate" education while others receive a more-than-adequate education.

must constantly react to these changing conditions, and we believe that the system they have

established has effectively done so.

The Supreme Court has consistently recognized the tremendous importance of education in this country.

> [E]ducation is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. *Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.*

*Brown v. Board of Educ.*, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954) (emphasis added). Minnesota has recognized the importance of educating children as well. In *State v. Newstrom*, 371 N.W.2d 525 (Minn. 1985), Justice Wahl noted with approval that:

> In *Brown* itself, the Court relied for its revolutionary holding on the recognition that the circumstances under which a child is educated can and do impart to children social messages of their claims to equality and self-respect which "may affect their hearts and minds in a way unlikely ever to be undone."

*Id.* at 532 (citing *Brown*, 347 U.S. at 494, 74 S.Ct. at 691). Yet with today's holding, we send the social message to some of our children that opportunities for the future which come with the best education are only available if they were fortunate enough to be born into a family living in a wealthy school district.

Unlike the Minnesota Constitution, the United States Constitution does not have an Education Clause; and, therefore, the U.S. Supreme Court declined to find education a fundamental right in *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1975). Even so, the Supreme Court acknowledged this country's "historic dedication to public education." *Id.* at 30, 93 S.Ct. at 1295.

A fundamental right is a right that is expressly or implicitly protected by the constitution. *State v. Gray,* 413 N.W.2d 107, 111 (Minn.1987). Thus, the court correctly holds that education is a fundamental right in Minnesota, as it is expressly guaranteed by our state constitution. Minn. Const. art. XIII. We have traditionally held that strict scrutiny will be applied where a fundamental right has been limited. *Essling v. Markman,* 335 N.W.2d 237, 239 (Minn.1983). However, the court has chosen to apply the rational basis test rather than strict scrutiny to determine whether Minnesota's school finance system violates any child's fundamental right to an education. I believe that application of the rational basis test in this case is contrary to established precedent in the area of fundamental rights. *See, e.g., University of California Regents v. Bakke,* 438 U.S. 265, 357, 98 S.Ct. 2733, 2782, 57 L.Ed.2d 750 (1978) (Brennan, White, Marshall, and Blackmun, JJ., concurring in the judgment in part and dissenting in part).

Strict scrutiny should be given to any legislative action which affects a child's right to an education. Minnesota's school finance system directly affects each Minnesota child's fundamental right to an education. To pass strict scrutiny, such a classification must be necessary for a compelling government interest. *Bolin v. State, Dept. of Pub. Safety,* 313 N.W.2d 381, 383 (Minn.1981) (citing *Illinois State Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 184–5, 99 S.Ct. 983, 990–91, 59 L.Ed.2d 230 (1979)). Under strict scrutiny, this funding scheme fails because there is no compelling state interest in creating disparities in the educational opportunities for children of differing school districts. While the state has a compelling interest in providing extra funding for districts with a large concentration of low income students, for districts with sparse populations, for desegregation expenses, or for complying with the Americans with Disabilities Act, no compelling interest exists for creating disparities in educational opportunity which

are based solely on a school district's wealth. As noted in Justice Tomljanovich's concurring opinion, the state also has a compelling interest "in encouraging additional public money to be spent on education," but there can be no compelling interest in creating disparities in educational opportunity. Therefore, I would hold that the provisions of the school finance system before us abridge the fundamental right to an education held by each child attending school in less wealthy districts.

The court goes to great lengths to distinguish the fundamental right to an education from education funding, but there is no meaningful distinction between the two. Nothing in the Education Clause of our constitution suggests that the fundamental right to an education applies only to the education itself, not to the money needed to fund that education. Education does not occur in a vacuum; it is achieved as the result of public expenditures. Any system which provides greater expenditures for some children over others should undergo the most exacting scrutiny.

Because education is a fundamental right, each child has a right to an equal opportunity to be educated. Education is the tool which enables children to prepare themselves for the future. Giving any child an advantage over others because of the wealth of the school district in which he or she lives denies children who do not live in such districts the opportunity to prepare for the future on equal footing. It harms the state generally by creating a disparity in the relative abilities of children educated in our schools. Indeed, this disparity in the opportunity to learn ensures that the disparity in wealth will continue into the future.

Appellants have lost sight of the purpose of our education system. In their briefs and arguments to this court, they repeatedly focus on the funding needs of the school districts, as opposed to educating the child. At oral argument, counsel for the intervenor went so far as to say that children do not have a right to equal educational opportunity. This argument, apparently adopted by the court, ignores the intended beneficiary of our education system: the children who attend our schools. The Education Clause of our constitution makes no reference to school districts. Article XIII, Section 1 states: "The stability of a republican form of government *depending mainly upon the intelligence of the people,* it is the duty of the legislature to establish a general and uniform system of public schools" (emphasis added). I read this language to say that the education of all children is paramount, and that the education system and its funding must provide equal opportunity for all children.

The court repeatedly states that the funding system is constitutional because it provides at least an adequate education for all children. A state's duty to satisfy a fundamental right is not fulfilled if it provides merely an adequate level to one group of people while providing a more-than-adequate level to another group.

The constitutional mandate for our education system, and by inference for its funding mechanism, is to develop the "intelligence of the people" so that all are prepared to deal with the difficult economic, social, political, and moral issues of the future. Failing that, "the stability of our republican form of government" is placed in jeopardy. If our education system is to be successful in achieving its goal, all children must have an equal opportunity to be educated. The court's decision today ensures that some of our children will be less prepared than others for the difficult issues of the future.

I dissent.

GARDEBRING, Justice (concurring in part, dissenting in the judgment).

I join in the dissent of Justice Page.