**In the Matter of the EXPULSION OF E.J.W. FROM INDEPENDENT SCHOOL DISTRICT NO. 500.**

No. C2–01–273.

Court of Appeals of Minnesota.

Aug. 28, 2001.

Steven T. Rizzi, Jr., Erin E. Lindhart, Alderson, Ondov, Leonard, Sween & Rizzi, P.A., Austin, MN, (for relator ISD # 500).

Thomas C. Baudler, Baudler, Baudler, Maus & Blahnik, Austin, MN, (for respondent E.J.W.).

Mike Hatch, Attorney General, Martha J. Casserly, Assistant Attorney General, St. Paul, MN, (for respondent Department of Children, Families and Learning).

Considered and decided by G. BARRY ANDERSON, Presiding Judge, RANDALL, Judge, and SCHUMACHER, Judge.

## OPINION

RANDALL, Judge

The school district expelled a student for his alleged involvement in a bomb threat. The student appealed, and the Minnesota Department of Children, Families & Learning (DCFL) found that he was denied constitutional and statutory rights. This certiorari appeal by the school district followed. The school district argues that

the Pupil Fair Dismissal Act only required it to provide the names of witnesses actually called during the expulsion hearing. It also argues that the Data Practices Act requires law-enforcement agencies to restrict public access to investigative data and that when the school district receives a law-enforcement report, the identity of all juvenile witnesses becomes private educational data, which may not be disclosed except under specified circumstances. The school district argues that withholding the names of the non-testifying student witnesses and not providing an opportunity for E.J.W. to confront and cross-examine them did not violate E.J.W.'s due-process rights. Finally, the school district claims that it presented substantial evidence at the hearing to support the student's expulsion. We affirm the Department of Children, Families & Learning.

## FACTS

On October 16, 2000, a threat was written on the boys' restroom mirror at Southland High School in Adams, Minnesota: "bomb in school to go off at 12:30." The police were called, the building was evacuated, and the students were dismissed for the day. No bomb was found. Police Chief Gordon Briggs and Detective Mark May questioned several students about the bomb threat, including E.J.W., who was then a ninth-grade student.

The first boy, who admitted that he was involved in planning the threat, told police officers that he and E.J.W. tried to talk another boy ("the second boy") into writing the threat, and that E .J.W. offered a pack of cigarettes to the second boy if he would agree to write the threat. The first boy did not testify at the hearing.

The second boy, who eventually admitted to writing the threat on the restroom mirror, told police officers the names of the boys who induced him to write the

threat. He did not say that E.J.W. bribed him to write the threat. He did say, however, that E.J.W. was one of the people in the hallway guarding the restroom door while he was inside writing the message on the mirror. The second boy did not testify at the hearing.

A third boy, who was not involved in the bomb threat, first told the police that he overheard E.J.W. and two other students in the gym talking about writing the bomb threat. The boy, however, said later in the conversation with the police that the boys became quiet when he approached them in the gym and that he "later found out what was going on," as stated in the police report. The third boy also did not testify at the hearing. All three of these boys' statements were admitted at the hearing as hearsay testimony through the police officers.

E.J.W. testified at the hearing that the boys next to him in the locker room were trying to induce the second boy to write the bomb threat. E.J.W. denied encouraging the second boy to participate in any way in the threat. He also denied being a guard at the restroom door. E.J.W. said that he did not do anything to discourage the conversation in the locker room or in the hallway. In fact, another boy, D.V., testified at the hearing that E.J.W. was not standing near the restroom door during the incident, but rather another boy was guarding the door. He testified that E.J.W. was on the other side of the hallway from the restroom and that E.J.W. walked over to the other side of the hallway to get a drink from the fountain and then returned across the hall.

Several students and a teacher heard advance rumors of a proposed bomb threat and did not notify the school principal before the incident took place. The school principal testified that no students would be disciplined for advance knowledge of

the threat, only those who actively participated in it. The school district concluded that E.J.W. was involved in the threat and sought to expel him for the remainder of the school year.

Relator Independent School District No. 500 (the district) provided E.J.W. with a list of the witnesses who would testify at the hearing (the principal, Chief Briggs, and Detective May) and copies of the police reports with the names of all the other students redacted. Before the hearing, E.J.W. requested in writing an unredacted copy of the police reports from the school district. The district did not comply, claiming that the information was "confidential and/or private student data." At the beginning of the hearing, testimony generically referred to the student witnesses; no names were used. E.J.W. objected. Following the objection, at the request of the district's counsel, the names of the student witnesses were revealed to E.J.W.'s attorney. Then they were redacted from the transcript for the remainder of the hearing. E.J.W. could only cross-examine the principal, Chief Briggs, and Detective May about what the student witnesses had told them. No direct evidence linking E.J.W. with the bomb threat was provided at the hearing.

The hearing officer found that E.J.W. was involved in the threat, but to a lesser degree than were two other students. He recommended that E.J.W. be expelled for the remainder of the fall semester, rather than the full year as the district requested. E.J.W. appealed to the commissioner of the DCFL.

The commissioner found that E.J.W. was denied his statutory and constitutional due-process rights by not being allowed to confront and cross-examine the student witnesses—the only witnesses—to his alleged involvement in the bomb threat. The commissioner held that without testimony from the students, the district lacked a substantial basis to expel E.J.W. The commissioner remanded the case to the district for a new hearing, at which E.J.W. would have an opportunity to confront and cross-examine the student witnesses, or for reinstatement of E.J.W. and expungement of all references of the incident from his record. This appeal follows.

## ISSUES

1. Does the Minnesota Government Data Practices Act prevent the school district from disclosing the names of the student witnesses from the expulsion hearing?

2. Did the commissioner err in determining that the school district's failure to call the student witnesses to the incident violated E.J.W.'s due-process rights?

3. Did the commissioner err in determining that the school district lacked a sufficient basis to expel E.J.W.?

## ANALYSIS

### I. The Pupil Fair Dismissal Act

The Pupil Fair Dismissal Act, Minn.Stat. §§ 121A.40–.56 (2000) (PFDA), establishes procedures for the suspension, exclusion, or expulsion of public school pupils. The PFDA expressly provides for the appeal of a district's exclusion or expulsion decision to the commissioner of the DCFL and limited judicial review of that body's decision under the Administrative Procedure Act. *Id.* §§ 121A.49–.50.

An administrative agency's decision may be reversed only if the decision violates a constitutional provision, is outside the statutory authority or jurisdiction of the agency, is based on unlawful procedures, reflects an error of law, is unsupported by substantial evidence, or is arbitrary or capricious. Minn.Stat. § 14.69. The burden of proof is on the party ap-

pealing the agency's decision. *Markwardt v. State, Water Res. Bd.*, 254 N.W.2d 371, 374 (Minn.1977).

## II. Disclosure of Students' Names

The district argues that the names of the students who witnessed the incident and spoke to the police were investigative data for the law-enforcement agency and remained private data when shared with the district under the Minnesota Government Data Practices Act, Minn.Stat. § 13.01–13.99 (2000) (GDPA). It asserts that the identity of the student witnesses is educational data, which are private data, and can only be disclosed when properly requested. *See* Minn.Stat. § 13.32, subd. 3.

██ Investigative data collected by a law-enforcement agency for purposes of preparing a case against an individual who committed a crime or other offense are considered confidential while the investigation is active. Minn.Stat. § 13.82, subd. 7. Once the investigation is no longer active, (i.e., completed) data are no longer confidential or protected nonpublic data. *Id.* However, law enforcement may withhold public access to the identity of juvenile witnesses if law enforcement deems that the subject matter of the investigation justifies protecting their identity. *Id.*, subd. 17(g).

Nonpublic data can be accessed by a "responsible authority" when such "access is authorized or required by statute or federal law." Minn.Stat. § 13.05, subd. 9. A school district is by definition a state agency, which qualifies as a "responsible authority" under section 13.05. Minn.Stat. § 13.02, subds. 16, 17. The district claims that the investigative data became educational data, which are private data, when it received the information from law enforcement, but cites no authority holding the district had a right to the data or

establishing that the data should be deemed educational data.

Educational data are "data on individuals maintained by a public educational agency * * * which [relate] to a student." Minn.Stat. § 13.32, subd. 1(a). Generally, law-enforcement records that are part of a public education agency and are maintained separately from educational data only for law enforcement purposes and are not shared with non-law enforcement officials are *not* considered educational data. *Id.*

In this case, the Adams police officers are not part of the school district and the law enforcement records are maintained separately from the district's records. Simply because the police shared their report with the district does not convert the information into educational data subject to restrictions on disclosure, particularly in light of the fact that law-enforcement records that are part of an educational system would *not* be so classified. Once the police investigation was completed, the information became public information. Nothing in the evidence adduced at the hearing established that police had determined that public access to the identity of juvenile witnesses was justified in this matter.

The names of the student witnesses were not provided to E.J.W. and the district did not compel their attendance. The district argues on appeal that the names were not disclosed to E.J.W. before the hearing "for fear of reprisal," because of the nature of the incident. This is a meritless argument. Such reasoning would mean that all criminal trials and disciplinary hearings would be based on total hearsay, and the constitutional guarantees of confrontation and cross-examination would be routinely violated. Ironically, the district immediately revealed the names of the juvenile witnesses at the hearing after

a motion by E.J.W.'s attorney. So much for the district's claim that the juvenile witnesses "deserved anonymity."

We conclude that the names of the student witnesses were not educational data under the GDPA, and E.J.W. should have been provided access to their names.

### III. Due Process

█ The district contends that it did not violate E.J.W.'s due-process rights because it was only required to disclose the names of the witnesses who would testify at the hearing, and it did so. The district also argues that E.J.W. had the right to compel the attendance of any person and to confront and cross-examine any witness from the district. Specifically, the district asserts that E.J.W. could have asked for a continuance when he learned the witnesses' names in the middle of the hearing and sought a subpoena to compel them to testify at the hearing. The district claims, therefore, that E.J.W. was not denied his due-process rights under *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). We disagree. The commissioner found that the district's failure to call the student witnesses at the hearing deprived E.J.W. of the opportunity for cross-examination and precluded the hearing officer from personally observing the demeanor of the witnesses in order to determine their credibility, thereby violating E.J.W.'s constitutional rights. We agree.

Education is a fundamental right. Minn. Const. art. XIII, § 1 (Education Clause); *Skeen v. State*, 505 N.W.2d 299, 302 (Minn.1993). The United States Supreme Court has stated that

a student's legitimate entitlement to a public education [is] a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence

to the minimum procedures required by that Clause.

*Goss v. Lopez*, 419 U.S. 565, 574, 95 S.Ct. 729, 736, 42 L.Ed.2d 725 (1975). In *Goss*, the Supreme Court held that a suspension of up to 10 days is a "serious event" for a child and requires at minimum some sort of notice and hearing. *Id.* at 576, 579, 95 S.Ct. at 737, 738. *Goss* also states that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." *Id.* at 584, 95 S.Ct. at 741. Minnesota law states that "[n]o public school shall deny due process or equal protection * * * to any [student] involved in a dismissal proceeding" that could lead to expulsion. Minn.Stat. § 121A.42.

*Mathews v. Eldridge* sets out three factors for determining the level of due process required:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335, 96 S.Ct. at 903 (citation omitted).

First, the private interest that will be affected is E.J.W.'s right to an education. The district argues that E.J.W.'s private interest is. his "right to school attendance," *rather than an education.* The district argues that since they can provide E.J.W. with alternative education opportunities, he is not being deprived of his right to an education. The Supreme Court held in *Goss*, however, that expulsion "could seriously damage the [student's] standing with

[his] fellow pupils and [his] teachers as well as interfere with later opportunities for higher education and employment." *Goss,* 419 U.S. at 575, 95 S.Ct. at 736. Receiving homework assignments rather than participating in the classroom and receiving direct instruction and benefiting from teacher involvement may have a similar impact on E.J.W.

Second, the risk of an erroneous deprivation of E.J.W.'s right to an education through the lack of disclosure of the names of student witnesses and the lack of an opportunity to confront and cross-examine them is compelling. Under the Pupil Fair Dismissal Act, the student has the right to compel attendance of anyone "who may have evidence upon which the proposed action may be based." Minn.Stat. § 121A.47, subd. 9 (2000). Chief Briggs's and Detective May's testimony was uncorroborated hearsay,[1] which was the basis of the hearing officer's recommendation to expel E.J.W. for the remainder of the fall semester. There was no direct evidence at the hearing on E.J.W.'s involvement in the incident. There were inconsistencies in some students' statements to the police, which did nothing but highlight the need for vindication of the constitutional right to confront and cross-examine witnesses. E.J.W. was unable to cross-examine a single student witness who implicated him, and he could not challenge their version of events or their credibility.

■ Finally, the administrative burden on the district to safeguard against depriving E.J.W. of due process is minimal. The hearing officer and school board have the power to subpoena student witnesses. The burden to compel attendance at the hearing *is on the school district* and the failure to do so is excused only for a compelling reason. *See* Minn.Stat. § 121A.47, subd. 2(f)(4) (stating student has right to confront and cross-examine witnesses); *see also Stone v. Prosser Consol. Sch. Dist.,* 94 Wash.App. 73, 971 P.2d 125, 128 (1999) (stating that, in factually and statutorily similar case, it must be established at hearing that the district tried to produce key witnesses and failure to appear was excused by compelling reason).

The district's argument that E.J.W. could have asked for a continuance once the names were revealed and subpoenaed them himself is meritless. The district had the burden of proof and the burden of production at the hearing, not E.J.W. If the district was not going to call the students as witnesses, E.J.W. was entitled to have their names *before* the hearing, so his attorney would have an opportunity to investigate and compel their presence by subpoena if that was deemed necessary to present an adequate defense. The district's stated concern that "improperly" disclosing the identity of the witnesses might subject it to claims by the juvenile witnesses pursuant to the GDPA is unwarranted. First, the names of the students were disclosed during the hearing by the district with virtually no objection. Second, the hearing was closed pursuant to statute, thereby offering some protection of the students' identities. *See* Minn.Stat. § 121A.47, subd. 5. Third, based on previous analysis, the GDPA does not actually prevent the district from disclosing the information for purposes of a contested hearing.

The commissioner of the DCFL properly determined that the district deprived E.J.W. of his due-process rights by failing

---

1. Hearsay is defined as
   a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.
   Minn. R. Evid. 801(c).

to call or identify the student witnesses to testify at the hearing.

## IV. Substantial Evidence to Expel

■ The commissioner of the DCFL concluded that without the additional testimony of the student witnesses, the hearing officer lacked a sufficient basis to expel E.J.W. The district argues that there was substantial evidence at the hearing to support the hearing officer's recommendation to expel E.J.W. because the principal, two police officers, and one student testified.

First of all, the principal had no first-hand knowledge of who was involved in the incident. He only testified as to how he learned about the threat, the steps taken to deal with it, and the circumstances that generally warrant some sort of disciplinary action. Second, Chief Briggs and Detective May testified about what the various students told them during the investigation and to what extent Briggs and May believed, based on those statements, that E.J.W. was involved in the incident. The statements of the student witnesses came through the police officers' testimony, which is hearsay (and in some instances, double hearsay). The one student who did testify only addressed where E.J.W. was standing in relation to the bathroom when the note was left on the mirror; he testified that he had no knowledge of E.J.W.'s involvement and that E.J.W. did not appear to be involved in the incident. E.J.W. testified and claimed no involvement in the incident. Instead, he claimed that he overheard conversations about the plan and did not say or do anything about it, much like other students and a teacher. The only people who supposedly had first-hand knowledge of E.J.W.'s involvement were the students who gave statements to the police and *did not testify at the hearing.*

■ "The recommendation of the hearing officer * * * shall be based solely upon substantial evidence presented at the hearing * * *." Minn.Stat. § 121A.47, subd. 12. Substantial evidence is defined as:

1. Such relevant evidence as a reasonable mind might accept as adequate to support a conclusion;
2. More than a scintilla of evidence;
3. More than some evidence;
4. More than any evidence; and
5. Evidence considered in its entirety.

*Cable Communications Bd. v. Nor–West Cable Communications P'ship,* 356 N.W.2d 658, 668 (Minn.1984) (citations omitted). The general rule governing the use of hearsay in administrative proceedings is that

in the absence of a special statute, an administrative agency cannot, at least over objection, rest its findings of fact solely upon hearsay evidence which is inadmissible in a judicial proceeding.

*State ex rel. Indep. Sch. Dist. No. 276 v. Dept. of Ed.,* 256 N.W.2d 619, 627 (Minn. 1977) (quotation omitted). E.J.W. objected to the hearsay at the hearing, and the hearing officer overruled the objection.

Without the testimony of the student witnesses, the hearing officer lacked an adequate basis, beyond hearsay, to support the conclusion that E.J.W. participated in the bomb threat. There is no direct evidence supporting that conclusion. In fact, the hearing officer's conclusion that E.J.W. did not participate in coercing the student to write the message on the mirror, but did act as a guard to the bathroom door, is in contradiction with Chief Briggs's professional assessment of the information he gathered from the student witnesses. We conclude that the commissioner correctly determined that the hearing officer lacked a sufficient basis to expel E.J.W.

Relative to the procedure on remand, the commissioner ordered the following, which we affirm verbatim.

The Board is to be commended for utilizing an independent hearing officer and affirming his recommendation in terms of the length of the expulsion. However, the District violated the Student's constitutional and statutory rights when it denied him the ability to confront and cross-examine witnesses at the expulsion hearing.

The expulsion proceeding must be remanded to the District. The District must determine if it will hold a new expulsion hearing, affording the Student the opportunity to confront and cross-examine the student witnesses who made statements implicating the Student in the bomb threat.

If a new hearing is held and the District wishes to utilize the information contained in the police reports, the District must provide the names of the student witnesses and subpoena them to testify. The Student must be given the right to confront and cross-examine the witnesses who implicated him in the bomb threat. Otherwise, the District may not use this information in its expulsion decision. As noted above, without this testimony, the District lacks sufficient basis to expel the Student.

The District shall notify the Student's counsel and CFL within five days of the date of this decision whether it will hold a new expulsion hearing for the Student.

If the District chooses not to go forward with a new hearing, the District shall immediately reinstate the Student as a student in good standing and expunge all references to the Student's expulsion on November 8, 2000, from the School from the District's school records and files.

If the District moves to hold a new expulsion hearing, it must be held within 10 days of the date of this decision, and the School Board's written decision must be received by [CFL] within 10 business days of the hearing.

## DECISION

■ We affirm the department's reversal and remand. The district must decide whether or not to hold a new expulsion hearing. If the district holds a new hearing and relies on the information contained in the police reports, the district must provide the names of the student witnesses and subpoena them to testify, thereby protecting E.J.W.'s right to confront and cross-examine those who implicated him. If the district elects to have the hearing, the district shall immediately notify E.J.W.'s counsel and the DCFL, and shall comply in all respects with the commissioner's order as to time limits.

If the district chooses not to go forward with a new hearing, the district shall immediately reinstate E.J.W. as a student in good standing and expunge all references to E.J.W.'s expulsion on November 8, 2000, from school records and files, as directed by the commissioner's order.

**Affirmed.**