STATE OF MINNESOTA

IN SUPREME COURT

A14-0803

Court of Appeals                                                            Stras, J.
                                                                 Took no part, Chutich, J.

Steven J. Jaeger,

                    Respondent,

vs.                                                            Filed:  August 31, 2016
                                                             Office of Appellate Courts

Palladium Holdings, LLC,

                    Appellant,

Franklin Financial, LLC, et al.,

                    Defendants.

_____

Mark Eldon Berglund, Berglund & Berglund, Ltd., Anoka, Minnesota; and

James W. Delaplain, Minneapolis, Minnesota, for respondent.

Jack E. Pierce and Brooke C. Nelson, Bernick Lifson, P.A., Minneapolis, Minnesota, for appellant.

_____

S Y L L A B U S

1.      Under Minn. R. Civ. P. 4.03(a), "then residing therein" means living at the named recipient's usual place of abode permanently or for an extended period when substitute service occurs.

1

2. Because respondent's son, who received the attempted service, had not lived at respondent's home for an extended period when he accepted service, the service was ineffective under Minn. R. Civ. P. 4.03(a).

3. The requirements of Minn. R. Civ. P. 4.03(a) are subject to strict compliance, and therefore whether an individual has actual notice is irrelevant to the determination of whether substitute service was effective.

Affirmed as modified.

O P I N I O N

STRAS, Justice.

This case arises out of the foreclosure of respondent Steven Jaeger's townhome in St. Louis Park. The validity of the foreclosure turns on whether Jaeger's townhome association properly served Jaeger's adult son with notice of the foreclosure under Minn. R. Civ. P. 4.03(a), which provides a method of substitute service. The district court concluded that the association's service on Jaeger's son was ineffective. The court of appeals affirmed the district court's decision. For the reasons that follow, we affirm.

I.

Jaeger purchased a townhome in St. Louis Park in August 1997. In March 2011, Jaeger took over the management of a car dealership in Wisconsin, which led to his frequent absence from the townhome. According to Jaeger, he stayed at the property fewer than 20 times in the following 3 years. Consequently, Jaeger relied on his adult son, J.C., to periodically check on the property in his absence. J.C. lived elsewhere, but he visited his father's townhome an estimated 20 to 30 times per year.

2

During the visits, J.C. would prepare the townhome for Jaeger's return by activating the heating or air conditioning. J.C. would also run the water, complete various maintenance tasks, and generally check on the property to make sure that no one had burglarized it since his last visit. After visiting the property, J.C. would call or text Jaeger to let him know whether the townhome was "okay." Although J.C. had a garage-door opener and could visit the property at any time, he stayed overnight at the townhome only "a few times" over the years. Occasionally, J.C. also received mail at the property. In fact, the mailbox contained a slip of paper that stated, "[p]lease accept mail for [J.C.]." In one instance, J.C. received his motor-vehicle registration at the townhome for a vehicle that he had jointly registered in both his and his father's names. Still, J.C. did not regularly receive mail there.

By May 2010, Jaeger was delinquent on his monthly dues to his homeowner's association, Skyehill Townhome Association ("Skyehill"). Skyehill obtained a lien on Jaeger's property as security for the unpaid dues. In 2011, Skyehill foreclosed on its lien by advertisement. Skyehill purchased the property at the foreclosure sale for $4,909.31, but later assigned the Sheriff's Certificate of Sale to Franklin Financial, LLC ("Franklin"). After Jaeger failed to redeem the property within 6 months of the sale, Franklin transferred the property to appellant Palladium Holdings, LLC ("Palladium") by quitclaim deed. Jaeger claimed that he only became aware of the foreclosure proceedings after the conclusion of the eviction proceedings in February 2013.

Following the eviction, Jaeger brought this action seeking a declaratory judgment that the foreclosure sale was legally void because Skyehill had failed to properly serve him

3

with advance notice of the sale, as required by Minn. Stat. § 580.03 (2014). The district court empaneled an advisory jury to resolve a factual dispute about whether Jaeger had actual notice of the foreclosure sale.

The evidence presented to the jury established that an individual from On Time Delivery attempted to serve Jaeger on Skyehill's behalf. The process server's personal records indicated that he gave the documents to the individual who answered the door of Jaeger's townhome on May 12, 2011. The individual who accepted service signed the service log as "J.C. Jaeger." The process server testified that, although he did not specifically recall the attempted service at Jaeger's townhome, his standard practice was to ask the person who answers the door if he or she lives there before leaving the process with someone other than the named recipient. Based on his standard practice, the process server said that he would not have attempted service unless J.C. had stated that he lived at the townhome. J.C. testified, by contrast, that he did not accept service or sign the service log.

The district court determined that service was ineffective under Minn. R. Civ. P. 4.03(a), the substitute-service rule, because J.C. was not "residing" in Jaeger's townhome when Skyehill attempted to serve Jaeger. The court's findings focused primarily on whether Jaeger had actual notice of the foreclosure sale, which was the factual dispute that led to the use of an advisory jury. Based on the advisory jury's finding that Jaeger did not have actual notice of the sale, the court adopted a strict interpretation of Minn. R. Civ. P. 4.03(a). Applying its strict interpretation, the court declared that the substitute service was deficient, the foreclosure sale and the subsequent transfers of Jaeger's property were void, and Jaeger was the property's rightful owner.

4

In a 2-1 decision, the court of appeals affirmed the district court's decision and adopted a bifurcated reading of the substitute-service rule. *Jaeger v. Palladium Holdings, LLC*, No. A14-0803, 2015 WL 1513982 (Minn. App. Apr. 6, 2015). The court reasoned that substantial compliance with the substitute-service requirements is sufficient when a party has received actual notice of the action. *Id.* at *1 (citing *Thiele v. Stich*, 425 N.W.2d 580, 584 (Minn. 1988)). The court of appeals also determined, however, that "strict compliance with rule 4 [was] required" in this case because Jaeger did not have actual notice of the foreclosure sale. *Id.* at *3-4. The process server, in other words, had to strictly comply with the requirement that the "person of suitable age and discretion" receiving the documents—in this case, J.C.—was "then residing" in the townhome. Because "J.C. did not live at the property when substitute service upon him was attempted," the service was ineffective. *Id.* The dissent, in contrast, adopted a functional approach to substitute service, reasoning that there was a sufficient nexus between J.C. and his father to give "some reasonable assurance" that the notice would reach Jaeger. *Id.* at *5 (Connolly, J., dissenting) (citing *O'Sell v. Peterson*, 595 N.W.2d 870, 872 (Minn. App. 1999)).

II.

The question presented by this case is whether Skyehill adequately served Jaeger with the notice of foreclosure by advertisement. To initiate foreclosure-by-advertisement proceedings, Minn. Stat. § 580.03 requires two forms of notice. The first type of notice is publication of the foreclosure sale at least 6 weeks before the sale occurs. *Id.* The second type of notice is that, at least 4 weeks before the foreclosure sale, a copy of the published notice must "be served in like manner as a summons in a civil action in the district court

5

upon the person in possession of the mortgaged premises, if the same are actually occupied." *Id.* The parties do not dispute that Skyehill published notice at least 6 weeks in advance of the foreclosure sale and that Jaeger was "in possession of the mortgage premises." Rather, Jaeger argues that Skyehill did not comply with Minn. R. Civ. P. 4.03(a), which governs the service of a "summons in a civil action in the district court."

Service upon an individual of notice of a foreclosure sale or a summons in a civil action can occur in one of two ways under Rule 4.03(a). First, the process server can deliver "a copy to the individual personally." Minn. R. Civ. P. 4.03(a); *Walsh v. U.S. Bank, N.A.*, 851 N.W.2d 598, 606 (Minn. 2014) (discussing the requirements of personal service). Second, the process server can leave "a copy at the individual's usual place of abode with some person of suitable age and discretion then residing therein." Minn. R. Civ. P. 4.03(a). This case turns on the residency requirement of the second form of service, which is commonly known as substitute service. *Walsh*, 851 N.W.2d at 606.

A.

To evaluate the adequacy of the substitute service, we must first determine what it means for an individual to be "then residing therein" under Rule 4.03(a). We interpret the Minnesota Rules of Civil Procedure de novo and follow a rule's plain language when it is unambiguous. *See Walsh*, 851 N.W.2d at 601. "Ambiguity exists only if the language of a rule is subject to more than one reasonable interpretation." *Id.*

When a statute or a rule does not contain a definition of a word or phrase, we look to the "common dictionary definition of the word or phrase" to discover its "plain and ordinary meaning." *See State v. Brown*, 792 N.W.2d 815, 822 (Minn. 2011). We can

6

separate a phrase into its "component terms" and then reconstruct it to determine its meaning if the phrase is not a term of art, lacks a technical meaning, and is not otherwise defined in the statute or rule. *See Nelson v. Schlener*, 859 N.W.2d 288, 293 (Minn. 2015); *KSTP-TV v. Ramsey Cty.*, 806 N.W.2d 785, 790 (Minn. 2011). This separate-and-reconstruct method of interpretation is a corollary of our obligation to give words and phrases their plain and ordinary meaning.

The parties dispute what it means for the individual who receives the substitute service to have been "then residing therein." The plain and ordinary meaning of the word "reside," of which "residing" is a form, is "[t]o live in a place permanently or for an extended period." *The American Heritage Dictionary of the English Language* 1493 (5th ed. 2011); *see also* 4A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1096 (4th ed. 2015) (stating that the recipient of substitute service "must be actually living in the same place as the defendant who is to be served"). The word "then," which precedes the word "residing," requires that the analysis of residency occur at the point in time when the process server attempts service. *See The American Heritage Dictionary of the English Language* 1804 (defining "then" as "[a]t that time"); *Webster's Third New International Dictionary* 2370 (2002) (same). Finally, the word "therein" provides the object of analysis by referring back to the named recipient's "usual place of abode." *See The American Heritage Dictionary of the English Language* 1806 (defining "therein" as "[i]n that place, time, or thing"); *Webster's Third New International Dictionary* 2372 (defining "therein" as "in or into that place").

7

Reassembling the component terms, the phrase "then residing therein" in Rule 4.03(a) means that, for substitute service to be effective, the person accepting the service must have lived in the named recipient's place of abode permanently or for an extended period at the time when the process server attempts service. This interpretation is consistent with our previous explanations of Rule 4.03's residency requirement, including our recent decision of *Walsh v. U.S. Bank, N.A.*, 851 N.W.2d 598 (Minn. 2014). One of the issues in *Walsh* was whether the individual who received substitute service, whom the process server referred to as "Jane Doe" and described as an "occupant" of the property, was "then residing therein" on the date of the attempted service. *Id.* at 600. Without giving a definitive interpretation to the residency requirement, we explained that, "at the time of service, a person's *mere physical presence* at the owner's usual place of abode does not establish that the person was a resident therein." *Id.* at 606 (emphasis added). The lesson from *Walsh* is that something more than mere presence at a property is required for an individual to validly accept substitute service. In this case, we add the missing ingredient left undecided in *Walsh* by clarifying that the individual who accepts substitute service must have lived at the named recipient's abode permanently or for an extended period for the service to be effective.

In adopting this interpretation, we reject the functional definition of "residing" advanced by Palladium and adopted by the court of appeals' dissent. The functional definition, first articulated in *O'Sell v. Peterson*, 595 N.W.2d 870 (Minn. App. 1999), requires only "a nexus between the individual and the defendant that establishes some reasonable assurance that notice would reach the defendant." *Id.* at 872. The factors that

8

can establish the nexus include "a relationship of confidence" between the third party accepting the substitute service and the named recipient; the "duration" and "frequency" of the third party's presence; the third party's "intent to return" to the premises; and any "evidence that the service actually reached the intended person." *Id*. at 872-73.

As *O'Sell* itself recognizes, the justification for its interpretation of Rule 4.03(a) was the Due Process Clause of the 14th Amendment, rather than the rule's text. *See id.* at 872. *O'Sell* explained that "evidence that the service actually reached the intended person strongly supports a conclusion that service is valid because due process has been afforded." *Id.* at 873. *O'Sell*'s nexus test therefore provided the means to determine whether the service was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 872 (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).

The *O'Sell* decision, however, flipped the applicable analysis. Procedural due process provides a constitutional floor that requires any notice to be "reasonably calculated" to "apprise interested parties of the pendency of the action" before depriving them of life, liberty, or property. *Mullane*, 339 U.S. at 314; *id.* at 313 (describing the "minimum" requirements of due process); *see also Greene v. Lindsey*, 456 U.S. 444, 449 (1982) (explaining that *Mullane*'s discussion of the Due Process Clause "prescribe[s] a constitutional minimum"). Nothing in *Mullane* or the Due Process Clause of the 14th Amendment, however, prevents states from adopting rules of procedure that exceed the minimum requirements of due process. Here, the starting point for the analysis is the text

9

of Rule 4.03(a), not the constitutionally minimum requirements of due process. To the extent that *O'Sell* was deciding only the constitutional question, its reasoning is unhelpful to our interpretation of Rule 4.03(a)'s text. To the extent that *O'Sell* attempts to definitively interpret Rule 4.03(a)'s substitute-service requirements, as the parties in this case assert, we overrule it because it is inconsistent with our interpretation today. In either case, we decline to follow *O'Sell*.

B.

Having explained what it means to be "then residing therein" under Rule 4.03(a), we next examine the facts to determine the adequacy of Skyehill's substitute service on J.C. Whether service of process is effective presents a question of law that we review de novo. *See Shamrock Dev., Inc. v. Smith*, 754 N.W.2d 377, 382 (Minn. 2008). In the context of service of process, the residency of an individual presents a question of fact. *See Kueffner v. Gottfried*, 154 Minn. 70, 72, 191 N.W. 271, 272 (1922) (explaining that the identification of a "usual place of abode" is a question "of fact"); *see also Berryhill v. Sepp*, 106 Minn. 458, 459, 119 N.W. 404, 405 (1909) (stating that, in the context of service, " 'abode' and 'residence' may be synonymous"). Accordingly, when reviewing whether substitute service is effective, we must defer to the district court's factual findings on the residency of the individual served unless they are clearly erroneous. *See Shamrock Dev.*, 754 N.W.2d at 382.

The focus of this case is on J.C., who was physically present at the property when Skyehill attempted service. At the time, J.C. was serving as caretaker of the property to prepare the townhome for his father's return. Besides these caretaking duties, however,

10

there is no evidence that J.C. was regularly present at the townhome, much less that he was living at the townhome when Skyehill attempted to serve notice of the foreclosure sale.[1] Nor were any indicia of an extended occupancy present, such as J.C. storing his personal property on the premises or regularly receiving mail at the townhome. Even if J.C.'s role as caretaker meant that he was more than just physically present at the townhome when the process server handed the notice to him, we cannot say that the district court's conclusion that J.C. was not "then residing" at the townhome was clearly erroneous.

Palladium nevertheless compares J.C.'s caretaker status to cases from other jurisdictions, including one involving a college student visiting home. The decision, *M. Lowenstein & Sons, Inc. v. Austin*, concluded that a college student visiting her parent's residence for an overnight stay was "then residing" under the federal substitute-service rule. 430 F. Supp. 844, 845 (S.D.N.Y. 1977) (applying Fed. R. Civ. P. 4(d)(1)). This decision, however, is consistent with the conclusion that we reach today. College students often list their parents' address as a permanent address, which makes it one of their residences. It is analogous to having a summer home in Minnesota and a winter home in Florida. The student may come home from school over a long weekend and on holidays,

---

[1] At trial, the process server testified that, although he did not specifically recall serving J.C., his standard practice when attempting substitute service was to ask the person who answered the door if he or she lived at the property before serving the documents. The advisory jury determined that J.C. received the notice from the process server, which could lead to a reasonable inference that the jury believed that J.C. told the process server that he was living at the townhouse. Even so, the advisory jury's finding, which the district court accepted, does not prove that J.C. was "residing" at Jaeger's townhome when the process server delivered the notice to J.C. In fact, the district court specifically found that J.C. was "living independently at a separate address at the time [Skyehill] attempted substitute service on [Jaeger]."

11

but he or she may also return home for an extended period during the summer months. Although the court did not discuss these specific circumstances in *M. Lowenstein*, it did specifically find that the student had "return[ed] *home* from college to stay at least overnight at her parents' residence," which indicates that she considered it one of her residences, stayed there more than occasionally, and presumably lived there before departing for college. *Id.* at 845 (emphasis added).

In this case, by contrast, no one asserts that the townhouse was J.C.'s home. There is no evidence that J.C. had ever lived in his father's townhome for an extended period or that he stayed in the townhome any more often than one stays at a hotel or other temporary lodging.[2] In fact, at oral argument, Palladium conceded that there was "no dispute that J.C. Jaeger *lived* . . . about a mile [or a] mile-and-a-half down the road." (emphasis added). We therefore agree with the district court that J.C. was not "then residing" in Jaeger's townhome when Skyehill attempted substitute service. Accordingly, service in this case was ineffective. *See Tullis v. Federated Mut. Ins. Co.*, 570 N.W.2d 309, 311 (Minn. 1997) (explaining that service of process in a manner not authorized by rule is ineffective).

---

[2]    By holding that an individual accepting substitute service must have lived in an abode for an "extended period," we are not suggesting that there is some minimum period of occupancy that must be satisfied. Rather, a determination of residency will depend on the facts and circumstances of each case, and as the *M. Lowenstein* case implies, at a minimum requires more than a temporary stay. *See, e.g.*, *Webster's Third New International Dictionary* 804 (defining "extended" in the context of time as "drawn out in length" with the example of "extended residence in England"). In fact, we do not exclude the possibility that, depending on the facts, an individual will be able to establish his or her residency in a matter of weeks or even days. In this case, however, there are no facts other than the process server's generalized testimony that suggest that J.C. was a resident of his father's townhome.

C.

Even though we ultimately agree with the court of appeals' conclusion that the substitute service on J.C. in this case was ineffective, we disagree with the court of appeals' emphasis on actual notice. According to the court of appeals, "actual notice is the determinative factor regarding whether [Rule 4.03(a)] requires strict or substantial compliance." *Jaeger*, 2015 WL 1513982, at *3. The court explained that there is an exception to the requirement of strict compliance with the substitute-service rule when the named recipient has received actual notice of the action and the delivery of the documents occurs at the named recipient's place of abode. *Id.* at *1.

The court of appeals' reasoning conflates the concepts of compliance and construction. We have recognized that, in certain circumstances, a court should give a strict or liberal construction to an ambiguous rule or statute. *See, e.g.*, *Do v. Am. Family Mut. Ins. Co.*, 779 N.W.2d 853, 858 (Minn. 2010) (quoting *Rosenberg v. Heritage Renovations, LLC*, 685 N.W.2d 320, 327 (Minn. 2004)) ("Generally, statutes in derogation of the common law are to be strictly construed."); *S.M. Hentges & Sons, Inc. v. Mensing*, 777 N.W.2d 228, 232 (Minn. 2010) (stating that remedial statutes are given a liberal construction when they are ambiguous). We have also required strict or substantial compliance, depending on the circumstances, with the unambiguous requirements of a statute or rule. *See, e.g.*, *Ruiz v. 1st Fid. Loan Servicing, LLC*, 829 N.W.2d 53, 57-58 (Minn. 2013) (determining that Minn. Stat. § 580.02(3) (2014), which requires that all assignments of a mortgage be recorded before a party can foreclose by advertisement, should be subject to strict compliance); *Jenkins v. Bd. of Educ. Special Sch. Dist. No. 1*,

13

303 Minn. 437, 440, 228 N.W.2d 265, 268 (1975) (holding that only substantial compliance was required with the notice-of-claim requirements in Minn. Stat. § 466.05, subd. 1 (2014)). These concepts, however similar they may sound, are not the same.

In this case, the court of appeals determined that Skyehill had to strictly comply with Rule 4 because the advisory jury found that Jaeger had not received actual notice of the foreclosure sale. The court of appeals then suggested that, if Jaeger had received actual notice, "the term 'then residing therein' [would] encompass[] . . . more persons" because only substantial compliance with the rule would be required. *See Jaeger*, 2015 WL 1513982, at *4.

The court of appeals confused the concepts of construction and compliance when it concluded that the proper interpretation of the rule depended on the existence of actual notice. *See Jaeger*, 2015 WL 1513982, at *2-4 (discussing the concepts of strict and substantial compliance interchangeably with "strict versus liberal interpretation of a service rule"). Contrary to the court of appeals' conclusion, we have interpreted service rules in accordance with their plain language regardless of whether the intended recipient has received actual notice of the action. *See, e.g.*, *Melillo v. Heitland*, 880 N.W.2d 862, 864 (Minn. 2016) (holding that the plain language of the service-by-mail rule, Minn. R. Civ. P. 4.05, "must be followed"); *Shamrock Dev.*, 754 N.W.2d at 383 (interpreting the service-by-publication rule, Minn. R. Civ. P. 4.04(a), in accordance with its plain language).

With respect to the separate question of compliance, we have also long held that "service must accord strictly with statutory requirements." *Berryhill*, 106 Minn. at 459, 119 N.W. at 404; *see In re Skyline Materials, Ltd.*, 835 N.W.2d 472, 477 (Minn. 2013)

14

("Statutory provisions for service of notice must be strictly followed in order for a court to acquire jurisdiction."). By using the word "shall" to describe its requirements, Rule 4.03 mandates strict compliance with its terms. Minn. R. Civ. P. 4.03; *see also Safety Signs, LLC v. Niles-Wiese Const. Co.*, 840 N.W.2d 34, 38 (Minn. 2013) ("In analyzing whether strict compliance with a statute is mandatory, we are guided by the language of the statute.").

In fact, in *MacLean v. Lasely*, we decided that substitute-service requirements are subject to strict compliance:

> In making such substituted service there must be a strict compliance with the statute. The necessity of the statutory service is not dispensed with by the mere fact that defendant may in some way learn of the existence of the papers and an attempted service. On the other hand, if there has been legal substituted service, it is immaterial whether defendant has had actual knowledge thereof.

181 Minn. 379, 380, 232 N.W. 632, 632 (1930). Although *MacLean* predates our adoption of the Minnesota Rules of Civil Procedure, there is no reason to treat substitute service under Rule 4.03(a) any differently than we did in *MacLean* when substitute service was purely a creature of statute. Accordingly, because substitute service is subject to strict compliance regardless of the circumstances, it is irrelevant whether the intended recipient receives actual notice of the action.[3]

---

[3] Jaeger claims that the court in *MacLean* "found questionable substitute service valid only *because* the defendant received actual notice." We disagree. The question in *MacLean* was whether substitute service of a summons and complaint in a sealed envelope was effective. *MacLean*, 181 Minn. at 380, 232 N.W. at 632. We held that the service satisfied statutory requirements, but then addressed whether delivering the documents in a sealed envelope rendered the service ineffective. We explained that, "[h]ad the sealing of the envelope prevented defendant's seasonable knowledge of the service, we would hold

15

Only one of our decisions, *Thiele v. Stich*, suggests that substantial compliance is sufficient. 425 N.W.2d 580 (Minn. 1988). In *Thiele*, we addressed whether leaving the process with a receptionist at the defendant's law office was sufficient to constitute personal service. *Id.* at 581. Substitute service was not at issue in *Thiele* because the defendant's law office was not his usual place of abode. We concluded that the service was ineffective, declaring that it "did not comply with [Minn. R. Civ. P. 4.03(a)] in any way." *Thiele*, 425 N.W.2d at 584. Just two sentences earlier, however, we noted that "[a]ctual notice will not subject defendants to personal jurisdiction absent substantial compliance with Rule 4." *Id.* This sentence from *Thiele* has led to actual notice becoming the "determinative factor" in some recent court of appeals opinions addressing substitute service. *Jaeger*, 2015 WL 1513982, at *3; *see also Van Note v. 2007 Pontiac*, 787 N.W.2d 214, 219-20 (Minn. App. 2010) (relying on the "combination of actual notice and substantial compliance" to conclude that the substitute service was effective); *O'Sell*, 595 N.W.2d at 872-73 (discussing actual notice and substantial compliance in the context of substitute service).

This statement from *Thiele* is not nearly as significant as it seems. Importantly, *Thiele* did not even discuss *MacLean*, much less overrule it. *See Thiele*, 425 N.W.2d at

_____

the service invalid, notwithstanding the general rule that it is immaterial whether defendant has actual knowledge of such substituted service." *Id.* at 380, 232 N.W.2d at 633. We reasoned that a party should not be able to seal the envelope to keep the named recipient of the service from having the opportunity to learn of the action. In this respect, Jaeger is correct that actual knowledge was important to the outcome, but the issue arose not because the plaintiff used substitute service, but rather due to the "unusual practice of sealing the papers in the envelope," which could have hidden the service or concealed the document. *Id.* at 380, 232 N.W.2d at 632-33. Such concerns are not present here.

16

584. Instead, *Thiele* cites only two cases from the United States Court of Appeals for the Ninth Circuit that applied the concept of substantial compliance to the substitute-service requirements of the *Federal* Rules of Civil Procedure. *Id.* (citing *Benny v. Pipes*, 799 F.2d 489, 492 (9th Cir. 1986) and *Jackson v. Hayakawa*, 682 F.2d 1344, 1347 (9th Cir. 1982)).

This observation leads to the second point, which is that, when read in context, the statement from *Thiele* was largely descriptive, not prescriptive, for it was preceded by the observation that the " 'actual notice' exception has been *recognized* only in cases involving substitute service at defendant's residence." *Thiele*, 425 N.W.2d at 584 (emphasis added). By using words such as "may" and "recognized" to describe the exception, we were essentially assuming without deciding that the exception existed, not determining that such an exception actually existed. *Id.* (citing only *Larson v. Hendrickson*, 394 N.W.2d 524, 526 (Minn. App. 1986) and *Minn. Mining & Mfg. Co. v. Kirkevold*, 87 F.R.D. 317 (D. Minn. 1980)).

But even if our statement was an attempt to import the substantial-compliance rule from the two Ninth Circuit decisions we cited and apply it to our own substitute-service rule, the statement from *Thiele* was still dictum and therefore not binding on us. *State v. Timberlake*, 744 N.W.2d 390, 395 n.7 (Minn. 2008) (quoting *State ex. rel. Foster v. Naftalin*, 246 Minn. 181, 208, 74 N.W.2d 249, 266 (1956)) ("Dicta are generally 'considered to be expressions in a court's opinion which go beyond the facts before the court and therefore are the individual views of the author of the opinion and not binding in subsequent cases.' "). In *Thiele*, we concluded that the delivery of the documents to the receptionist at the law office was ineffective because it "clearly violat[ed] the rule." 425

17

N.W.2d at 584. In reaching that conclusion, it made no difference whether we evaluated the service for strict or substantial compliance because, under either approach, the service was ineffective. Accordingly, anything we said later about when substantial compliance applies was dictum because it was unnecessary to the decision. *See State v. Rainer*, 258 Minn. 168, 179, 103 N.W.2d 389, 396 (1960) ("Of course, a ruling not necessary to the decision of a case can be regarded as only dictum." (internal quotation marks omitted)); *State ex rel. Foster v. Naftalin*, 246 Minn. 181, 208, 74 N.W.2d 249, 266 (1956) (identifying dicta as statements that "go beyond the facts before the court"). We therefore conclude that *MacLean*, not *Thiele*, governs.[4]

## III.

For the foregoing reasons, we affirm the decision of the court of appeals.

Affirmed as modified.

CHUTICH, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

---

[4] To the extent that other decisions have cited *Thiele* as authoritative on the relationship between actual notice and substantial compliance in substitute-service cases, we conclude that those statements are no more binding on us than the statement from *Thiele*. *See, e.g.*, *In re Coleman*, 793 N.W.2d 296, 302 (Minn. 2011) (ascribing to *Thiele* the proposition that "[i]n cases involving substitute service at a defendant's residence, the rules governing service are liberally construed when the intended recipient had actual notice of the lawsuit"); *Tullis*, 570 N.W.2d at 311 (citing *Thiele* for the proposition that "actual notice of the lawsuit will not subject defendants to personal jurisdiction without substantial compliance with Rule 4.03"). Like *Thiele*, none of these cases involved substitute service.

18