ANDERSON, Justice (dissenting).
Appellants contend that their children attending Minneapolis and Saint Paul public schools are denied the right to an "adequate education" as guaranteed by the Minnesota Constitution because the schools are "segregated on the basis of both race and socioeconomic status." They seek an order from the district court requiring the delivery of an "adequate" education to the students. Because I conclude that any "adequacy" of education protected by the fundamental right to an education, as guaranteed by the Education Clause, is textually committed to the Minnesota Legislature, I conclude that appellants' claims are not justiciable under the political-question doctrine. I therefore dissent from the court's opinion and would affirm the court of appeals.
I.
The court of appeals determined that appellants' claims presented nonjusticiable political questions. Cruz-Guzman v. State , 892 N.W.2d 533, 541 (Minn. App. 2017). Questions of justiciability are issues of law that we review de novo. See In re Custody of D.T.R. , 796 N.W.2d 509, 512 (Minn. 2011). My analysis begins with the text of the constitution, then turns to the doctrines of judicial restraint to which we adhere. See, e.g. , In re McConaughy , 106 Minn. 392, 119 N.W. 408, 417 (1909) (explaining that a political question typically "has been specifically delegated to" another branch of government and "[t]he courts have no judicial control over" such questions when "delegated to the Legislature").
When we interpret the text of the Minnesota Constitution, we determine first whether the language in question is ambiguous. See State v. Brooks , 604 N.W.2d 345, 348 (Minn. 2000) (interpreting Article I, Section 7 ). When constitutional language is unambiguous, we apply that language as written. See Kahn v. Griffin , 701 N.W.2d 815, 825 (Minn. 2005). Article XIII, Section 1 of the Minnesota Constitution states:
The stability of a republican form of government depending mainly upon the intelligence of the people, it is the duty of the legislature to establish a general and uniform system of public schools. The legislature shall make such provisions by taxation or otherwise as will secure a thorough and efficient system of public schools throughout the state.
The text of the Education Clause commands the Legislature to establish a public school system that is "general and uniform." Id. The second sentence instructs the Legislature to make fiscal investments in that "general and uniform system of public schools" sufficient to ensure that it is "thorough and efficient." Id. Plainly and unambiguously, the people of Minnesota *16 put upon the Legislature "the duty" to provide a system of education. Id. ; Skeen v. State , 505 N.W.2d 299, 308 (Minn. 1993) ("This Clause places a duty on the legislature...."). As we have said previously, the Education Clause is a "constitutional mandate" on the Legislature that provides all Minnesotans with a fundamental right to an education. Skeen , 505 N.W.2d at 313.
The first paragraph of the complaint makes clear that appellants' claims are founded on assertions that the Minnesota Constitution requires the Legislature to deliver an "adequate" education to students, that the Legislature has failed to do so, and that these claims are cognizable by Minnesota courts.[1] Merely casting claims as constitutional violations, however, does not require, or permit, the judiciary to act. See Ninetieth Minn. State Senate v. Dayton , 903 N.W.2d 609, 623-24 (Minn. 2017).
The first barrier, of course, is that nowhere in the plain language of the state constitution do the words "adequate education" appear, let alone in the context of requiring the Legislature to provide an "adequate education" to residents of Minnesota. Setting Skeen aside for the moment, no decision of our court has imposed this requirement on the Legislature.[2] Further, state constitutional education clause litigation elsewhere has focused on education-financing issues, not on the kind of "adequacy" claims advanced in this litigation. See, e.g. , Gannon v. State , 306 Kan. 1170, 402 P.3d 513, 524-26 (2017) (reviewing an "adequacy" challenge to the school "financing system"); Rose v. Council for Better Educ., Inc. , 790 S.W.2d 186, 190 (Ky. 1989) (same); Pauley v. Kelly , 162 W.Va. 672, 255 S.E.2d 859, 863 (1979) (same). Appellants have cited no precedent for the relief sought here that looks remotely like the present controversy, and I have found none. The plain language of the Minnesota Constitution does not permit the "adequacy" claims asserted by appellants.
*17 But assuming, as both appellants and the court assume, that a legislative duty to provide for an adequate education exists, how is that duty defined and enforced?
Taking the allegations of the complaint as true, as we must at this stage of the litigation, there is no question that the educational performance of the Minneapolis and Saint Paul schools identified in the complaint is appalling. So, why not have the courts act as a check on the legislative and executive branches of government, which have failed to provide an "adequate" education?[3] As attractive as that option might seem, ultimately, we lack authority to address what is fundamentally a political question; put another way, the claims of appellants are not justiciable.
Logic demands that, for the judiciary to find inadequacy, it must first define what is adequate. This raises the question of whether such an exercise of judicial power is proper.
We characterize the contours of the limits to the judicial power in different ways. We ask whether we have jurisdiction over parties or matters. See, e.g. , County of Washington v. City of Oak Park Heights , 818 N.W.2d 533, 538 (Minn. 2012) (subject matter jurisdiction); Juelich v. Yamazaki Mazak Optonics Corp. , 682 N.W.2d 565, 569 (Minn. 2004) (personal jurisdiction). We also ask whether the issues in the case are ready to be decided, Schober v. Comm'r of Revenue , 853 N.W.2d 102, 108 (Minn. 2013) (ripeness), and whether a party has or will sustain an injury, State v. Philip Morris Inc. , 551 N.W.2d 490, 493 (Minn. 1996) (standing). Further, we often ask whether the particular question posed to us is suitable for judicial determination because it presents a sufficiently concrete dispute between adverse parties, Schowalter v. State , 822 N.W.2d 292, 298-99 (Minn. 2012) (advisory opinion), or whether the question presented would improperly entangle the judiciary in the constitutional authority committed to our coordinate branches of government, McConaughy , 119 N.W. at 417 (political questions). Among these and several more considerations, what we are really asking is whether the exercise of the judicial power in a given case is proper.
Although conceptually distinct, all of these justiciability considerations arise from the enduring obligation of the judiciary to maintain its rightful role and function in our constitutional form of government. See League of Women Voters Minn. v. Ritchie , 819 N.W.2d 636, 651 (Minn. 2012) ("The proper role for the judiciary ... is not to second-guess the wisdom of policy decisions that the constitution commits to one of the political branches."); State v. Merrill , 450 N.W.2d 318, 321 (Minn. 1990) ("[T]he role of the judiciary is ... to decid[e] whether a statute is constitutional, not whether it is wise or prudent legislation."); see also Warth v. Seldin , 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (explaining that the constitutional and prudential limitations on the jurisdiction of federal courts are "founded [on] concern[s] about the proper-and properly limited-role of the courts in a democratic society"). Indeed, the point of judicial caution and prudence is to preserve the separation of powers among the branches of our government that is enshrined in the Minnesota Constitution. See, e.g. , Limmer v. Swanson , 806 N.W.2d 838, 839 (Minn. 2011) (declining to resolve "fundamental *18 constitutional questions" involving other branches of government).
Article III, Section 1 of the Minnesota Constitution provides:
The powers of government shall be divided into three distinct departments: legislative, executive and judicial. No person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others except in the instances expressly provided in this constitution.
"[E]ach branch of government is given its own powers, [and] the powers given have a constitutionally limited scope...." Ninetieth Minn. State Senate , 903 N.W.2d at 627 (Anderson, J., dissenting). We have said that the Judicial Branch lacks "the power to control, coerce, or restrain the action of the other two [branches] within the sphere allotted them by the Constitution wherein to exercise judgment and discretion." State ex rel. Burnquist v. Dist. Court , 141 Minn. 1, 168 N.W. 634, 636 (1918).
When the constitution textually commits a matter to another branch of government and that branch acts within the scope of its powers, we cannot review the political judgments and discretionary actions of that branch or its officials. "[O]ne of the highest duties resting upon the judicial department ... is to refrain from trespassing upon the domain assigned to either of the other departments." Gollnik v. Mengel , 112 Minn. 349, 128 N.W. 292, 292 (1910) ; see McConaughy , 119 N.W. at 417 (explaining that a political question "is a matter ... [that] has been specifically delegated to some other department or particular officer of the government" and that the judiciary "ha[s] no judicial control over such matters").
From Montesquieu[4] to Madison,[5] there is no principle professed as more responsible for the preservation of liberty than the separation of powers of government. The judiciary is the foremost bulwark against encroachments between the branches. As was stated in Gollnik :
The fact that under the Constitution the responsibility of maintaining the separation in the powers of government rests ultimately with the judiciary should make a court, from whose decision there is no appeal, hesitate before assuming a power as to which there is any doubt, and resolve all reasonable doubts in favor of a co-ordinate branch of the government, *19 unless such conclusion leads to a palpable wrong or absurdity.
128 N.W. at 292.
II.
With these principles in mind, I turn to the question of whether the claims of appellants are nonjusticiable political questions. Although it is true, as the court notes, that we have long heard and determined cases arising from the Education Clause, I conclude that the claims presented in this case are nonjusticiable political questions.
What is generally meant, when it is said that a question is political, and not judicial, is that it is a matter which is to be exercised by the people in their primary political capacity, or that it has been specifically delegated to some other department or particular officer of the government, with discretionary power to act.
McConaughy , 119 N.W. at 417.
From our earliest decision in Curryer v. Merrill , 25 Minn. 1 (1878), to our more recent decision in Skeen , 505 N.W.2d at 313, we have entertained challenges under the Education Clause. But in my view those cases are not instructive for two reasons. First, there is no discussion of justiciability in our decisions. Second, the claims here are fundamentally different from all of the claims we have previously reviewed precisely because they would force the judiciary into a role that we cannot accept.
Appellants, and the court, rely heavily on language in Skeen that uses the word "adequate." But in Skeen , as with education clause cases around the country, we examined whether the statutory scheme financing our education system was constitutional. See 505 N.W.2d at 307-08. The adequacy language in Skeen must be taken as limited to either school-financing issues-something very different from what is at issue here-or dicta.[6] Skeen simply does not stand for the broad "adequacy" concepts that appellants assert in their complaint, and our precedent confirms that we have declined to interfere with the policy decisions inherent in how the Legislature fulfills its "duty" under the Education Clause.
In Curryer , we reviewed the constitutionality of a statute, holding that it did not violate the Education Clause. 25 Minn. at 4-5. We said that the question of how or what educational measures should be adopted "is one of legislative and not judicial cognizance." Id. at 5. In State ex rel. Klimek v. School District No. 70 , we held that the Education Clause did not mandate free transportation for all school children. 204 Minn. 279, 283 N.W. 397, 398-99 (1939). We noted that the language of the constitution did not require that "school districts ... provide free transportation to school children" and that, in the absence of such a constitutional mandate, "[w]e must look to the statutes to determine the extent, nature and character of the powers of [school districts]." Id. ; see also Bd. of Educ. of Minneapolis v. Erickson , 209 Minn. 39, 295 N.W. 302, 304 (1940) (noting that the "method by which [the] objectives" of the Education Clause are accomplished is "left to legislative determination").
*20 In all of those cases, we were asked to examine the constitutionality or validity of enacted legislation. Appellants, on the other hand, refer to statutes only insofar as they allege that those statutes contribute to an "inadequate" education; they do not challenge the constitutionality of those statutes.[7]
Klimek demonstrates the problem with adjudicating appellants' claims. The statute at issue in Klimek empowered school districts to provide transportation to their students. See 283 N.W. at 398. We construed the language of the statute to be permissive and held that the Education Clause did not elevate the grant of power in the statute to a duty. Id. at 398-99.
Now, suppose, instead of a constitutional provision, there was a statute that guaranteed an "adequate" education to all students, spelling out several factors used in determining whether a given education is adequate. Suppose also that the statute provided a cause of action for students who were deprived of their statutorily guaranteed right, with prescribed remedies that regularly attend such statutes. Appellants would be here asking us to determine questions of law within the scope of a duly enacted statute. We could turn to the statute to "determine the extent, nature and character of the powers," id. at 399, of any given defendant and perform our well-established role "to say what the law is," Marbury v. Madison , 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). The challenge before us, however, is not whether a statute is constitutional or whether the acts or omissions of government actors complied with the language of a statute. We are not asked to apply the law as written; appellants urge us to write the law, a job assigned to the Legislature. See, e.g. , State v. Ali , 855 N.W.2d 235, 268 (Minn. 2014) (Stras, J., concurring in part, dissenting in part) (stating that "the judiciary does not write statutes" and that "[a]mending statutes is, and always has been, the Legislature's job").
Any particular content of the right to an education is a matter of politics and policy that is committed to the Legislature. As we stated in Curryer :
[T]he whole matter of the establishment of public schools, the course of instruction to be pursued therein, how they shall be supported, upon what terms and conditions people shall be permitted to participate in the benefits they afford-in fine, all matters pertaining to their government and administration-come clearly within the range of proper legislative authority.
25 Minn. at 5. As the plain and unambiguous language of the Education Clause instructs, to fulfill its constitutional obligations, the Legislature need only "establish a general and uniform system of public schools." Minn. Const. art. XIII, § 1 ; see Skeen , 505 N.W.2d at 315 ("[T]he state has satisfied its constitutionally-imposed duty of creating a 'general and uniform system of education.' "). Even if inherent judicial power empowers us to make policy judgments, a proposition we need not reach here, our authority would still be limited to the traditional domain of the judiciary, for example, good-faith extensions of our state's common law in light of societal changes or advancements in the law. This is because we are a branch of government wholly unsuited to *21 setting constitutional minimums in educational adequacy, whether it be the provision of textbooks, the availability of particular courses, or even the organization of school districts. Ninetieth Minn. State Senate , 903 N.W.2d at 623 (noting that "[t]he impasse that led the parties to the courtroom stems from disputes that are ill-suited for judicial resolution" because the parties ask the judiciary to resolve disputes over "a quintessentially political process"). These decisions are outside the scope of sound judicial decision-making.
The political nature of the inquiry that appellants would have us undertake is illustrated by decades of legislative enactments designed to improve state educational policy. And if further evidence is required, the current budget adopted by the Legislature and approved by the Governor provides for elementary and secondary education in a manner that makes the education component of state spending the largest single expenditure from the general fund.[8]
The Legislative and Executive Branches have consistently sought to create and implement educational policies and a successful statutory educational framework, clearly seeking to improve the public school system in our state.[9] From the creation of the district system of public schools in the early years after statehood, see Act of Mar. 6, 1862, ch. 1, § 1, 1862 Minn. Gen. Laws 17, 18 (codified at Minn. Gen. Stat. ch. 36, § 1 (1863) ), to the adoption of open enrollment[10] and the authorization of charter schools[11] in our more recent past, education has rightly been within the purview of the other branches. Indeed, the Legislature has often established the achievement of an adequate education as a goal. For example, in the 1970s, the Council on Quality Education was established "to encourage, promote and aid such research and development in elementary and secondary schools, to evaluate the results of such programs and disseminate information about [the] same throughout the state." Act of Oct. 30, 1971, ch. 31, art. 15, § 1, 1971 Minn. Laws Extra Sess. 2561, 2600 (codified at Minn. Stat. §§ 3.924 -.925 (1971) ).[12]
These policy- and politically-based initiatives illustrate a separate, immutable fact: the adequacy of education-and thus the sufficiency of the Legislature's compliance with its constitutional duty-must be constantly *22 reevaluated as proposals, budgets, enrollment, learning objectives, initiatives, and education resources change and evolve. It is not the province of the judiciary to monitor or judge the wisdom of the policy and political decisions made to address the many factors that might lead to change in any given education year.
Appellants recognize the problem posed by their request to involve the judiciary in a duty textually committed to the Legislature because they insist that they seek only a declaration that the current model is unconstitutional. The outcome of this declaration, they suggest, should be left to the Legislature. Wisely, the court here makes no attempt to design a system of "adequate" education, leaving that Herculean task to the parties and the district court. But deferring, in the first instance, to a legislative response is no answer; in the end, a district court will be asked to pass judgment on plans, perhaps many plans, extending over many years, to assure that an "adequate" education is provided to students. And, assuming that a final judgment is eventually entered and an appeal taken, appellate courts will then weigh in on the definition of an "adequate" education and whether that standard is constitutional. The Judicial Branch will not be a bystander to this construction project; it will have final approval over what is built and how.
The point of the political-question doctrine is to keep the three branches of government in their respective lanes. The task the court has now assigned to the Judicial Branch is inherently subjective, undefined, historically and textually the province of the Legislature, deeply political, and one for which the judiciary has no demonstrable expertise.
I am reminded of the principle of Chesterton's fence: before taking down a fence, it is wise to ponder why the fence was constructed in the first place. See G.K. Chesterton, The Thing 35 (1957). Here, we take down a fence constructed to avoid judicial entanglement with political questions. I fear we do not fully appreciate the consequences that will follow, not only for the other branches of government but for the judiciary as well.
III.
Undeniably, the complaint paints a disturbing picture of some segregated and underperforming schools in and around the Twin Cities. Although it is true that the Judicial Branch must "say what the law is," Marbury , 5 U.S. (1 Cranch) at 177, it is also true that "[q]uestions, in their nature political, ... can never be made in this court," id. at 170. I do not question that Minnesota's children are the intended beneficiaries of the command we find in the Education Clause, and that the failings that appellants identify are more than troubling. But the plain language of that clause commits these issues to the Legislature and renders them unsuitable for judicial decision. See McConaughy , 119 N.W. at 417 ("Many questions arise which are clearly political, and not of judicial cognizance.").
For the foregoing reasons, I respectfully dissent.

I agree with the conclusion of the court of appeals that appellants' claims here are derivative of a purported right to an "adequate" education and are not traditional segregation claims based on racial discrimination. Cruz-Guzman , 892 N.W.2d at 536 n.1. Even under a liberal reading of the complaint, it is not sustainable to conclude otherwise. The complaint here, from the very beginning of the document, focuses on the alleged deprivation of the fundamental right to an education guaranteed by the Minnesota Constitution. These claims are clearly rooted in a fundamental-rights analysis rather than a traditional school-segregation approach. See Brown v. Bd. of Educ. , 347 U.S. 483, 494-95, 74 S.Ct. 686, 98 L.Ed. 873 (1954). I also agree with the court of appeals that, when those claims are properly pleaded, there is no question that traditional segregation claims based on racial discrimination are justiciable.

I recognize that the Skeen court referred more than once to an "adequate education" when discussing the Education Clause. 505 N.W.2d at 315 (concluding that the "fundamental right" under the Education Clause is "to a general and uniform system of education which provides an adequate education to all students in Minnesota" (internal quotation marks omitted) (emphasis added) ). The Skeen plaintiffs did not challenge "the adequacy of education in Minnesota," id . at 302 ; the court was not asked to determine whether the language of the Education Clause conferred a right to an adequate education (as opposed to a general, uniform, thorough, or efficient education system); and ultimately, the court held that the plaintiffs' claims failed to establish "a constitutional violation of the state constitutional provisions which require the state to establish a 'general and uniform system of public schools' which will secure a 'thorough and efficient system of public schools,' " id . at 312. Thus, I can only conclude that the references to an "adequate education" in Skeen are dicta. See Jaeger v. Palladium Holdings, LLC , 884 N.W.2d 601, 610-11 (Minn. 2016) (explaining that statements are dicta when they go beyond the facts before the court and are "unnecessary to the decision" in the case).

Whether the Education Clause secures a right to an "adequate" education does not affect my analysis. Even assuming that there is a fundamental right to an adequate education, I conclude that determinations of adequacy must be left to the political branches to be implemented by statute and regulations consistent with statutory authority.

"When the legislative and executive powers are united ... in the same body of magistracy, there can be then no liberty. ... [T]here is no liberty, if the power of judging be not separated from the legislative and executive powers." Montesquieu, The Spirit of Laws: A Compendium of the First English Edition 202 (David Wallace Carrithers ed., 1977).

James Madison described the separation of powers enshrined in the United States Constitution in Federalist Paper 47:
The magistrate in whom the whole executive power resides cannot of himself make a law, though he can put a negative on every law; nor administer justice in person, though he has the appointment of those who do administer it. The judges can exercise no executive prerogative, though they are shoots from the executive stock; nor any legislative function, though they may be advised with by the legislative councils. The entire legislature can perform no judiciary act, though by the joint act of two of its branches the judges may be removed from their offices, and though one of its branches is possessed of the judicial power in the last resort. The entire legislature, again, can exercise no executive prerogative, though one of its branches constitutes the supreme executive magistracy, and another, on the impeachment of a third, can try and condemn all the subordinate officers in the executive department.
The Federalist No. 47 , at 303 (James Madison) (Clinton Rossiter ed., 1961).

Skeen involved a constitutional challenge to a statutory framework, which is familiar territory for courts. In fact, courts nationwide have heard challenges to education-financing schemes. See, e.g. , Gannon v. State , 305 Kan. 850, 390 P.3d 461, 468, 475 (2017) (holding that the question of whether the education-financing scheme adopted by the Legislature, which had a constitutional duty to provide education, was justiciable). But see, e.g. , Okla. Educ. Ass'n v. State ex rel. Okla. Legislature , 158 P.3d 1058, 1065-66 (Okla. 2007) (holding the same issue to be a nonjusticiable political question).

For example, appellants claim that open-enrollment policies, see Minn. Stat. § 124D.03 (2016), and the exemption of charter schools from particular desegregation efforts, see Minn. Stat. §§ 124D.861 ; 124E.03, subds. 1-2 (2016), are causally related to the alleged inadequacy asserted in their claims. Appellants do not challenge, however, the constitutionality of those statutes or policies, either facially or as applied to their circumstances.

For the 2018-19 biennium, nearly $19 billion was spent on E-12 education, which represents more than 40 percent of all expenditures from the general fund. See Minn. Mgmt. & Budget, General Fund Pie Charts 2 (2018).

I endorse neither the merits of the reforms adopted by the Legislature nor appellants' criticisms of some of these reforms; I simply note this discussion illustrates the inherent character of educational reform as a political question.

See Act of May 6, 1988, ch. 718, art. 7, § 8, 1988 Minn. Laws 1668, 1721 (codified at Minn. Stat. § 124D.03, subd. 1(a) ).

See Act of June 4, 1991, ch. 265, art. 9, § 3, 1991 Minn. Laws 943, 1123-25 (codified as amended at Minn. Stat. §§ 124E.01, .05-.06 (2016) ).

Of course, there are countless examples of legislative and executive efforts to improve public education, including the Minnesota Educational Effectiveness Program, see Minn. Stat. § 121.609 (1983) ; Individualized Learning and Development Aid, see Minn. Stat. §§ 124.331 -.333 (1989); Outcome Based Education, see Minn. Stat. § 121.111 (1989) ; Some Essential Learner Outcomes, see, e.g. , Minn. Dep't of Educ., Some Essential Learner Outcomes for Physical Education 1-3 (George Hanson & Carl Knutson eds., 1978); Early Childhood Family Education, see Marsha R. Mueller, The Evaluation of Minnesota's Early Childhood Family Education Program , 19 Am. J. Evaluation 80, 80-81 (1998); and Graduation Standards and Profile of Learning, see Minn. Stat. § 120B.02 (1998).